IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* CLEVELAND A. TYSON, and THE STATE OF ILLINOIS *ex rel.* CLEVELAND A. TYSON, <br><br> Plaintiffs, <br><br> v. <br><br> AMERIGROUP ILLINOIS, INC., <br><br> Defendant. | Case No. 02C-6074 <br> Judge Coar <br> JURY TRIAL DEMANDED <br><br> FILED <br> OCT 1 4 2003 <br> MICHAEL W. DOBBINS <br> CLERK, U.S. DISTRICT COURT |

## NOTICE OF FILING

**To:** See service list attached.

PLEASE TAKE NOTICE THAT on October 14, 2003, I caused to be filed with the Clerk of the US District Court, Northern District of Illinois, Eastern Division, Plaintiff's **SECOND AMENDED COMPLAINT (2003)**, a copy of which is attached hereto and served upon you.

Michael C. Rosenblat
MICHAEL C. ROSENBLAT, P.C.
1701 East Lake Avenue, Suite 160
Glenview, IL 60025
847-657-0006

_____
Attorney for Plaintiff

## PROOF OF SERVICE

I, Michael C. Rosenblat, an attorney, certify that I served this notice by mailing a copy to each party to whom it is directed by depositing the same in the US Mail at 1701 East Lake Avenue, Glenview, Illinois by 5:00 pm on the 14th day of October 2003, with proper postage prepaid.

_____
Michael C. Rosenblat

**SERVICE LIST**
*United States of America, ex rel Tyson v. Amerigroup*
02C-6074

Daniel J. Voelker
Catherine A. Miller
Freeborn & Peters, LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606

Michelle M. Fox
Assistant United States Attorney
US Department of Justice
219 S. Dearborn
Chicago, IL 60604

Robert A. Barba
Assistant Illinois Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601

FILED
OCT 14 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 1 5 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT C

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* CLEVELAND A. TYSON, and THE STATE OF ILLINOIS *ex rel.* CLEVELAND A. TYSON,<br><br>Plaintiffs,<br><br>v.<br><br>AMERIGROUP ILLINOIS, INC.,<br><br>Defendant. | Case No. 02C-6074<br>Judge Coar<br>JURY TRIAL DEMANDED |

## SECOND[1] AMENDED COMPLAINT (2003)

Plaintiffs complain and state as follows:

### I. NATURE OF THE ACTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("the FCA"), and a related state false claims act, the Illinois Whistleblower Reward and Protection Act, 740 ILCS §§ 175/1 *et seq.* (Hereinafter, the FCA and the Illinois Whistleblower Reward and Protection Act will be referred to as the "FCAs." The United States and the State of Illinois are hereinafter referred to as the "Governments").

2. These false claims arise from Defendant, a managed care organization ("MCO"), and/or its agents, and employees knowingly presenting or causing to be presented false or fraudulent claims for payment or approval to the Governments and/or knowingly making, using,

---

[1] Pro Se Plaintiff misnamed his first amended complaint as his second amended complaint.



or causing to be made or used false records or statements to get false or fraudulent claims paid or approved by the Governments.

3. These false claims are based on Defendant's knowing submission of false certifications. The submission of certifications is a condition for receiving payment under the Medicaid managed care program. 42 CFR §§438.602, 438.604, and 438.606. The Defendant's certifications, which were false, were made on at least a quarterly basis to the Illinois Department of Public Aid, and on information and belief, are continuing to the present.

4. The Contract, with amendments, between Defendant and the Illinois Department of Public Aid is attached under Tab A, as Exhibits 1-7, and incorporated herein.

5. Title 42--Public Health Chapter IV--Centers For Medicare & Medicaid Services, Department Of Health And Human Services--Part 438--Managed Care states:

> As a condition for receiving payment under the Medicaid managed care program, an MCO, . . . must comply with the applicable certification, program integrity and prohibited affiliation requirements of this subpart.

42 CFR § 438. 602

6. Part 42 CFR § 438.604 states:

> (a) *Data certifications.* When State payments to an MCO or PIHP are based on data submitted by the MCO or PIHP, the State must require certification of the data as provided in § 438.606. The data that must be certified include, but are not limited to, enrollment information, encounter data, and other information required by the State and contained in the contracts, proposals, and related documents.
> (b) *Additional certifications.* Certification is required, as provided in § 438.606, for all documents specified by the State.

7. 42 CFR § 438.606 Source, content, and timing of certification, states in pertinent part:

2

        (b) Content of certification. The certification must attest, based on best knowledge, information, and belief, as follows: (1) To the accuracy, completeness and truthfulness of data. (2) That the MCO or PHP is in substantial compliance with its contract. (3) To the accuracy, completeness and truthfulness of documents specified by the State. (c) Timing of certification. The MCO or PHP must submit the certification concurrently with the certified data or, in the case of compliance with the terms of the contract, when requesting payment.

8.     Paragraph 5.21(a) of the Contract states in pertinent part:

        Fraud and Abuse Procedures
        (a) The Contractor shall have an affirmative duty to timely report suspected Fraud and/or Abuse in the Medical Assistance Program or KidCare by the Beneficiaries or others, suspected criminal acts by Providers or the Contractor's employees, or Fraud or misconduct of Department employees to the Public Aid Office of Inspector General.

        ***

        (3) the Contractor's procedure shall ensure that . . . if no reports were filed, the certification is received within thirty (30) days after the end of the quarter.

9.     Abuse is defined in the Contract as: "Abuse means a manner of operation that results in excessive or unreasonable costs to the Federal and/or State health care program." (Contract, Article I Definitions.)

10.     Fraud is defined in the Contract as: "Fraud means knowing and willful deception or misrepresentation, or a reckless disregard of the facts, with the intent to receive an unauthorized benefit." (Contract, Article I Definitions.)

11.     Defendant committed fraud, abuse or misconduct by:

(a) discriminating against Eligible Enrollees on the basis of such individuals' health status or need for health services. (Contract ¶ 3.2);

(b) terminating Enrollees because of an adverse change in the Beneficiary's health or cost of medical care. (Contract ¶ 4.4(c));

3

(c) failing to submit to the Department of Public Aid all marketing plans as required. (Contract ¶5.3);

(d) engaging in Marketing that misled, confused and/or defrauded both Eligible Enrollees and the Department. (Contract ¶5.3(a));

(e) discriminating against Eligible Enrollees on the basis of the health status, or need for health services, or on an illegal basis. (Contract ¶5.3(d));

(f) marketing in a manner designed to discriminate, and not reach a distribution of Eligible Enrollees across age and sex categories in the Contracting Area. (Contract ¶5.3(e));

(g) failing to notify the Department and the Office of Inspector General, in writing, of its inappropriate Marketing activities. (Contract ¶5.3(k));

(h) making misleading and untruthful statements to Eligible Enrollees, Prospective Beneficiaries or Beneficiaries regarding the merits of Enrollment in the Defendant's plan (Contract ¶5.4 (f));

12. Simply put, as a condition for receiving payments under the Medicaid managed care program, Defendant must comply with the applicable certification, program integrity and prohibited affiliation requirements of 42 CFR § 438.602, *et seq*. The data that must be certified includes, but is not limited to, enrollment information, encounter data, and information required by the State of Illinois and contained in the contract, proposals, and related documents. 42 CFR § 438.604(a) and 438.604(b). Payments would not have been made by the Governments, in fact the Governments could not have made these payments, if the Governments' knew that Defendant's certifications were false. By submitting false certifications, Defendant knowingly made, used or caused to be made or used a false record or statement in order to get false or

4

fraudulent claims paid or approved by the Governments. The Defendant's false certifications, which were submitted to the Governments, are attached under Tab B, as Exhibits 8-13, and incorporated herein. These certifications are false in that they either state that Defendant "has not identified any fraud, abuse or misconduct during the past quarter" or they failed to accurately, truthfully, and completely disclose the Defendant's fraud, abuse or misconduct as alleged herein.

## II.   PARTIES

13.   Relator, CLEVELAND A. TYSON ("Tyson" or "Relator") is a resident of Buffalo Grove, Illinois and a former employee of Defendant Amerigroup Illinois. Mr. Tyson brings this action for violations of the FCAs as set forth below, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, on behalf of the Governments under their respective *qui tam* provisions. Mr. Tyson was the Associate Vice President, Government Relations, from between June 2000 and March 2002. Mr. Tyson was a member of the senior staff and attended all senior staff meetings. Mr. Tyson reported directly to the Chief Executive Officer of Defendant, Dwight Jones, MD. Mr. Tyson also worked closely with the senior staff of Amerigroup's parent company Amerigroup, Corporation, located in Virginia Beach, Virginia, including its Chief Executive Officer Jeff McWaters, President Ted Wille, Chief Medical Officer, Lorenzo Childress, and its Chief Legal Officer, Stan Baldwin.

14.   Defendant AMERIGROUP ILLINOIS, INC. ("Amerigroup") is an Illinois Corporation with its principle place of business located in Chicago, Illinois. Amerigroup was formerly known as AMERICAID ILLINOIS, INC., and AMERICAID COMMUNITY CARE. Amerigroup operates in Illinois as a health maintenance organization ("HMO") pursuant to a Certificate of Authority issued by the State of Illinois, Department of Insurance, and the State of

5

Illinois Department of Public Health. Amerigroup is a wholly owned subsidiary of AMERIGROUP CORPORATION, with its principal place of business located in Virginia Beach, Virginia.

## III. JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

16. This Court has supplemental jurisdiction over the *qui tam* Relator's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution. This Court also has jurisdiction over the State's claims pursuant to 31 U.S.C. § 3732(b), as the State's claims arise from the same transactions and occurrences as the federal action.

17. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Defendant transacts business in the United States. Defendant can be found in, resides in, and/or transacts or has transacted business related to the allegations in this complaint within the Northern District of Illinois.

18. This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

19. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as Defendant can be found in, resides in, and/or transacts business in the Northern District of Illinois.

6

## IV. THE FEDERAL FALSE CLAIMS ACT

20. The False Claims Act provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $ 10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,
>
> * * *
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

> (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting. (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.
> (3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal.

31 U.S.C. § 3730.

## V. THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

21. The Illinois Whistleblower Reward and Protection Act provides, in pertinent part:

> (a) Liability for certain acts. Any person who:
> (1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
> (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid;
>
> * * *
>
> is liable to the State for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.
> (b) Knowing and knowingly defined. As used in this Section, the terms "knowing" and "knowingly" mean that a person, with respect to information:
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

§ 740 ILCS 175/3

> (b) Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 [*740 ILCS 175/3*] for the person and for the State. The action shall be brought in the name of the State. . . .
> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the State. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. . . .
> (3) The State may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. . . .

740 ILCS 175/4

8

## VI. DEFENDANT'S KNOWING SUBMISSION OF FALSE CLAIMS

### A. Medicaid Managed Care

22. Medicaid is a program that provides medical assistance for individuals and families with low incomes. The Medicaid program became law in 1965 and is jointly funded by the states and the federal government.

23. Over the past decade, the Federal Government has expanded the ability of state Medicaid agencies, including the Illinois Department of Public Aid ("IDPA"), the entity responsible for administering Medicaid in Illinois, to enter into contracts with managed care organizations to provide health care services to Medicaid beneficiaries. If Medicaid managed care is not mandatory, and it was not and is not in Illinois, individuals entitled to Medicaid health benefits may choose either the standard fee-for-service Medicaid program, or a managed care plan, if available in their area.

24. Under Medicaid managed care programs, a health plan is paid a predetermined payment per enrollee for the covered health care services. This predetermined amount is based on an age/gender category, and on actuarial studies of that population group. The health plan, in turn, arranges for the providing of such services by contracting with a network of providers who are then responsible for providing a comprehensive range of medical and hospital services.

25. The State of Illinois has a voluntary Medicaid managed care program.

### B. Defendant's Scheme to Defraud

26. Amerigroup entered into the Contract to provide health services with IDPA, on March 30, 2000, contingent upon the approval of the Health Care Financing Administration under the US Department of Health and Human Services.

9

27. However, upon receiving its contract, Amerigroup began a series of ongoing fraudulent marketing activities designed to ensure that Amerigroup provided services only to the healthiest of Medicaid eligible individuals.

### C. Cherry Picking

28. Voluntary managed care programs such as the program Amerigroup contracted to operate are susceptible to "cherry-picking." "Cherry-picking" or the selection of the healthiest segments of the enrollment population assures a managed care organization of higher profits by having to make fewer payments to providers. This relationship between the payments made to providers for health services by the managed care organization versus the predetermined payment per age/gender category made to the managed care organization is known as the medical loss ratio. The lower the medical loss ratio, the amount paid to providers, the higher the profits to the managed care organization. Cherry-picking is difficult to control in voluntary managed care organization programs such as in Illinois. Therefore, Federal law clearly prohibits discrimination on the basis of health status or "cherry-picking." *Guideline for Addressing Fraud and Abuse in Medicaid Managed Care, HCFA, A product of the National Medicaid Fraud and Abuse Initiative, October 2000.*

29. Amerigroup instituted a "cherry-picking" scheme to defraud the Governments in order to lower its medical loss ratio and thus increase its profits. On information and belief, this scheme is ongoing.

30. Specifically, Paul Hardwick, Associate Vice President of Marketing, for Amerigroup told the Relator, on or about March 6, 2002, and on several other occasions, that the marketing representatives were trained and supervised to walk away from pregnant women.

10

Thus, Amerigroup instructed its marketing representatives not to enroll pregnant women. All of Amerigroup's marketing to Medicaid recipients was conducted on a face to face basis.

31. The increased need for health services for pregnant women is factored into the set capitation rate Amerigroup is paid, by the Governments, for enrolled females age 14-20 and 21-44. (For example, in Cook County, the standard capitation rate for MANG beneficiaries beginning January 1, 2002 for females 14-20 is $231.98 while the capitation rate for males 14-20, is $80.18.) By avoiding pregnant women, Amerigroup stood to receive the higher capitation rate without any of the accompanying risks and without having to pay for prenatal/neonatal services. This therefore made Amerigroup's cost to provide services artificially low.

32. Paul Hardwick, told the Relator, on or about March 6, 2002, that Jeannie Hollis, RN, Associate Vice President of Medical Management, spoke to every class of new marketing representatives, and emphasized to them that they were not to enroll pregnant women into the plan.

33. Paul Hardwick told the Relator, the information contained in Paragraph 32 above, after a quarterly meeting, on March 6, 2002, with Nelly Ryan, Chief, Bureau of Managed Care, IDPA, after Ms. Ryan stated that it did not appear that Defendant was getting its proportionate share of live births. Ms. Ryan stated that IDPA did a comparison of live births in the fee-for-service program and Amerigroup's managed care program, and there was a huge discrepancy in the percentage of live births.

34. Thus, IDPA though aware of the disproportionate number of live births between, its fee-for service plan and Amerigroup's plan, was unaware of Amerigroup's fraud, abuse, and misconduct that resulted in this discrepancy.

11

35. In response to Ms. Ryan's observation, Dwight Jones, MD, Defendant's President and Chief Executive Officer, told Ms. Ryan that he could not understand why this was happening. Dr. Jones was aware of Defendant's discriminator marketing practices in that he approved all market training, policies, and procedures. Dwight Jones, however, falsely asserted to Ms. Ryan that Amerigroup would not discriminate on the basis of pregnancy.

36. Amerigroup's marketing representatives were also instructed to ask potential HMO enrollees about the need for specialists. If the prospective enrollee informed the marketing representative that they did have a need for a specialist the marketing representative was instructed to discourage the prospective enrollee from enrolling in Defendant's plan. This also served to keep Amerigroup's medical care costs artificially low.

37. Beginning early 2000, Jeannie Hollis, RN, told each new class of marketing representatives, during their initial training, that if a potential enrollee disclosed that they were currently undergoing a continuous course of treatment with a specialist, that the marketing representative should discourage the eligible Medicaid recipient from enrolling in the plan. This was not only to avoid the cost of the imminent medical services, but also to prevent having to pay a specialist who may not be a member of Amerigroup's provider network.

38. Jeannie Hollis told Relator, on or about March 6, 2002, that when she is notified of the birth of a pre-term baby, who will require an extensive stay in a neo-natal intensive care unit, she telephones IDPA, and has the premature baby retroactively disenrolled, out of the plan, and back on the fee-for-service plan. There are no provisions under the Contract which permit retroactive disenrollment under these circumstances.

39. As a condition for receiving payment under the Medicaid managed care program, Amerigroup is required by federal regulations and the Contract to make certain certifications in

12

order to receive payment. 42 CFR §§438.602, 438.604, and 438.606. Amerigroup also has affirmative obligations to disclose fraud and abuse pursuant to Section 5.21(a) of its contract with IDPA. Amerigroup falsely certified that it had not identified any fraud, abuse or misconduct, and failed to accurately, truthfully, and completely disclose the Defendant's fraud, abuse, or misconduct as alleged herein. These false certifications were made on at least a quarterly basis to IDPA and, on information and belief, are continuing to the present.

40. Amerigroup's marketing and "cherry picking" practices violate both their contractual obligations and federal regulations, and thus made their quarterly certifications false.

41. While engaging in these activities, Amerigroup also failed to submit to IDPA its true marketing plans, engaged in marketing plans that misled, confused and/or defrauded both Eligible Enrollees and the Department, failed to notify the Department and the Office of Inspector General, in writing, of its inappropriate Marketing activities, and made fraudulent, misleading and untruthful statements to Eligible Enrollees, Prospective Beneficiaries or Beneficiaries regarding the merits of Enrollment in the Defendant's plan, in violation of the Contract and federal regulations.

42. Despite Amerigroup's practice of committing fraud, abuse and misconduct, Defendant would submit false certifications on at least a quarterly basis to IDPA in order to receive payments from the Governments.

43. Additional documents, which would allow the Plaintiffs to allege Amerigroup's fraudulent conduct with greater specificity, are within Amerigroup's exclusive possession and control. These documents are not available to Plaintiffs, without compulsory process. Documents that would reflect these false claims include training manuals, emails, letters, reports, memorandum, and financial reports, etc.

44. Because of Defendant's submission of false claims to the Governments, the Governments have been damaged in the tens of millions of dollars.

## COUNT I
### (Federal False Claims Act – Presentation of False Claims)
### (31 U.S.C. § 3729 (a)(1))

45. Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

46. Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

47. By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II
### (Federal False Claims Act – Making or Using a False Record or Statement)
### (31 U.S.C. § 3729 (a)(2))

48. Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

49. Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

50. By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III
### (Illinois Whistleblower Reward and Protection Act – Presentation of False Claims)
### (740 ILCS 175/3(a)(1))

51. Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

52. Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the State of Illinois.

53. By virtue of the false and fraudulent claims made by Defendant, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT IV
### (Illinois Whistleblower Reward and Protection Act – Making or Using a False Record or Statement)
### (740 ILCS 175/3(a)(2))

54. Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

55. Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois.

56. By virtue of the false and fraudulent claims made by Defendant, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

WHEREFORE, Relator prays that the Court enter judgment against Defendant, and in favor of the Governments and Relator as follows:

A. Order Defendant to cease and desist from violating the False Claims Acts as stated herein.

B. Award the Governments the maximum amount of damages they sustained as a result of Defendant's actions, as well as the maximum amount of civil penalties, as permitted, for each violation of the Governments' False Claims Acts.

C. Award Relator Cleveland Tyson, the maximum reward allowed pursuant to the *qui tam* provisions of the Governments' False Claims Act.

D. Award Cleveland Tyson all costs and expenses including litigation costs and attorneys' fees.

E. Award the Governments and Relator Cleveland Tyson, all such relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands trial by jury.

By: _____

Attorney for Relator Plaintiffs

Dated: 10/14/ , 2003

Michael C. Rosenblat
MICHAEL C. ROSENBLAT, P.C.
1701 East Lake Avenue, Suite 160
Glenview, Illinois 60025
847-657-0006

Michael I. Behn
William W. Thomas
FUTTERMAN & HOWARD, CHTD.
122 S. Michigan Avenue, Suite 1850
Chicago, Illinois 60603
312-427-3600

16

**SEE CASE FILE FOR EXHIBITS**