

IN THE UNITED STATES DISTRICT COURT **F I L E D**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEP **1 3** 2006

**UNITED STATES OF AMERICA, *ex*** | JUDGE HARRY D. LEINENWEBER
***rel*. CLEVELAND TYSON; the** | U.S. DISTRICT COURT JUDGE
**STATE OF ILLINOIS, *ex rel*.**
**CLEVELAND TYSON; and THE**
**PEOPLE OF THE STATE OF**
**ILLINOIS,** | **Case NO. 02 C 6074**

**Plaintiffs,**

| **Hon. Harry D. Leinenweber**

**v.**

**AMERIGROUP ILLINOIS, INC. and**
**AMERIGROUP CORPORATION, INC.,**

**Defendants.**

## MEMORANDUM OPINION AND ORDER

The parties have filed Cross-Motions for Summary Judgment
relating to Plaintiff-Relator Cleveland Tyson, the United States of
America and the State of Illinois' (hereinafter, the "Plaintiffs")
claims that the Defendants Amerigroup Illinois, Inc. and Amerigroup
Corporation (hereinafter, the "Defendants") violated the Federal
Claims Act and the Illinois Whistleblower Reward and Protection
Act. For the reasons set forth below, both motions are denied.

## I. BACKGROUND

The following facts are taken from the parties' Local
Rule 56.1 Statements of Material Facts and accompanying exhibits.

### A. Managed Care Organizations

The Illinois Department of Public Aid, now known as the
Illinois Department of Healthcare and Family Services ("HFS") is

responsible for administering Medicaid in Illinois. In Illinois, individuals have the option of receiving Medicaid benefits through either a fee-for-service program or a managed care organization (an "MCO"). Under a fee-for-service program, HFS directly pays physicians who treat patients. Under a managed care organization, HFS pays an MCO a fixed monthly payment for each individual enrolled in the program. These payments are called "capitation" payments.

## B. Amerigroup Contracts

From 1996 through 2005, Amerigroup Illinois entered into contracts with HFS to provide health services through an MCO for Illinois Medicaid recipients. Amerigroup Illinois enrolled members through marketing representatives. The marketing representatives found potential enrollees on the street, at local neighborhood festivals and health fairs and initiated enrollment by submitting completed Managed Care Enrollment Forms to HFS. HFS processed the forms, determined the prospective member's eligibility and then, if eligible, enrolled the member. HFS paid Amerigroup Illinois the applicable capitation rate for each enrollee.

Under the terms of the contract, HFS made monthly capitation payments to Amerigroup Illinois based on its enrollees. The capitation rate depended, in part, on the age and gender of each member. The rates, determined by HFS, include a higher rate for women of childbearing years to account for the costs of pregnancy.

- 2 -

## C. Anti-Discrimination Laws and Provisions

The Social Security Act requires that contracts between HFS and MCO's contain provisions prohibiting discrimination against enrollees. Plaintiffs claim that the federal requirements forbidding discrimination on the basis of health were included in HFS's contracts with Amerigroup. When negotiating the contracts and in later correspondence, Amerigroup informed HFS that it would not discriminate on the basis of health status. Pursuant to § 5.11(a)(6) of the contracts, Defendants were to submit a quarterly fraud and abuse certification reporting "all allegations of Fraud, Abuse, or Misconduct of Providers, Beneficiaries or Department employees . . ." Pl. Ex. 2.

## D. United States Government Payments

The federal government pays Illinois for a certain portion of the Medicaid program through quarterly grants. Illinois submits a quarterly estimate to the United States for estimated costs, including an estimate for MCO services. The quarterly estimate is a Form CMS 37, which includes a certification that "budget estimates only include expenditures . . . that are allowable in accordance with the applicable implementing federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary and in effect during the fiscal year under Title XIX of the Act for the Medicaid Program." The United States uses the estimate in the CMS 37 to make a grant award for that

quarter. The award authorizes the state to draw federal funds as needed through a line of credit. At the end of each quarter, HFS submits its quarterly expenditure report, Form CMS 64, which details HFS' actual expenditures. The capitation payments to MCO's are included in Form CMS 64, which includes the same certification as CMS 37.

## E. Amerigroup's Policy for Enrolling Third-Trimester Pregnancies and Ill Members

On September 13, 1999, Jeanne Hollis, Amerigroup's Director of Medical Management, sent an e-mail to Dwight Jones, Chief Executive Officer for the Illinois Health Plan; Paul Hobson, Associate Vice President of Illinois Health Plan Operations; Anthony Garland, Vice President of Sales for Illinois; and Jeanne Seyer, Senior Vice President of Medical Management for Amerigroup Corporation. The subject of the email was "continuity of care training." The e-mail stated:

> With one of my primary objectives being to control medical costs, I wanted to keep you apprised of what is being done on the continuity of care issues. . . . Unfortunately one of the areas where I think the most impact could be shown had not been occurring. I had been under the impression that the individual marketing reps that were signing up these third trimester pregnancies were being talked to individually and today the field managers stated that this was not so. Paul stated that this was necessary and that he would meet with these reps with the field managers of the respective reps.
>
> On a going forward basis not will only Tony, Dwight and Paul be receiving the third trimester list but also the field managers as well as you Jeanne. This should

- 4 -

provide the information needed for the marketing managers to stay up on this daily with their reps.

Also I suggested to the field managers that they review daily with their marketing reps the applications that they bring in and make sure that the reps are not signing on members where there are continuity of care issues . . .

My concern is that we will continue to see high medical costs for at least the months of September and October due to the two month window between applications of members to the effective date. Hopefully all of these changes will begin to demonstrate impact in November at the latest.

Pl. Ex. 11.

A July 12, 2000 memo written by Jackie Washington was issued to eleven Amerigroup employees that discussed Amerigroup's policy on continuity of care. The memo, regarding "Continuity of Care," was issued because employees had recently enrolled pregnant women and stated:

On several different occasion[s] you were advised that continuity of care and third trimester is a very important issue of Amerigoup's. As stated in the contract, if the beneficiary is receiving medical care or treatment as inpatient/out-patient in an acute care hospital or clinic, the client health career [sic] should not be interrupted due to current treatment that the client may be receiving.

As an MCA and educator, our first duty is to assure that all clients are receiving excellent health care benefits from Amerigroup. Such treatment as continuity of care, this allow[s] the client to continue with the physician they are currently seeing until they are release[d] from the existing treatment plan they are currently receiving. The well being of the client is most important to the company.

Pl. Ex. 35, 36, 40.

- 5 -

On April 20, 2001, Hollis wrote another e-mail to Voncile Harrell, Paul Hardwick and Orlando Woods. The e-mail, written in response to a Third Trimester Pregnancy report stated, "Please keep up the good work with the marketing reps of not trying to sign up pregnant women." Pl. Ex. 14. Again Hollis wrote an e-mail on March 15, 2002 responding to an earlier e-mail regarding cost saving measures. The e-mail stated "And mostly we do not sign up pregnant members. We have trained the marketing staff constantly to not even approach a pregnant female about joining the plan." Pl. Ex. 21.

Amerigroup also addressed the enrollment of third trimester expectant mothers in its Performance Measurement and Quality Improvement Initiatives (the "PMQI"). Among the goals listed on the PMQI, one was to reduce the number of pregnant women in their third trimester in light of continuity of care issues. Pl. Ex. 20.

On September 6, 2002, Amerigroup's Medical Director, Dr. Prentiss Taylor sent Alvin Willis, the marketing trainer, an e-mail regarding the Third Quarter revised schedule. The e-mail states, ". . . [w]hen do you need us in Medical Management to give staff an update on our Maternal Care program and other programs? We also want to keep emphasizing every month (in person) to the staff that they shouldn't sign up 3rd trimester pregnant women." Pl. Ex. 11. Taylor sent an additional e-mail on February 8, 2002, re: marketing interactions with medical management. It stated, "we were

- 6 -

discussing earning improvement initiatives yesterday. We are volunteering to keep the lid on new 3rd trimester pregnant member enrollments by appearing **monthly** at field marketing meetings with the new staff you are bringing on." Pl. Ex. 23.

On October 3, 2002, Ron Austin e-mailed Ava Shelby and cc'd Jean Moise, Denise Gallagher and Leonard Johnson, "We have a big problem on our hands. In September we had 19 third trimester members. We need to come up with a strategy to curtail this." Pl. Ex. 31. Amerigroup also discussed third trimester pregnancies in its quarterly report for the third quarter of 2000, stating that it "[d]ecreased [the] number of members enrolling effective third trimester."

## II.  **ARGUMENT**

### A.  **Legal Standards**

#### 1.  *Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden is on the moving party to show that no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

Once the moving party presents a *prima facie* case showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256-57. All reasonable inferences must be viewed in favor of the non-moving party. *Halland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). When cross-motions are filed, we apply the same standard to each motion. *Stimsonite Corp. v. Nightline Markers, Inc.*, 33 F. Supp.2d, 703, 705 (N.D. Ill. 1999).

## 2. The False Claims Act

The False Claims Act (the "FCA") permits private persons to file a form of civil action against, and recover damages on behalf of the United States, from any person who:

(1) knowingly presents or causes to be presented, to an officer or employee of the Unites States Government . . . a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. §§ 3729(a)(1)-(2). Thus, in order to state a claim under the FCA, plaintiffs must show that Defendants (1) presented a claim for payment; (2) the claim was false; and (3) Defendants knew the claim was false. 31 U.S.C. §§ 3729(a)(1)-(2). The Illinois Whistleblower Act is virtually identical to the FCA. 740 ILCS

- 8 -

175/1 et seq.; *see also U.S. ex. rel. Humphrey v. Franklin-Williamson Human Services, Inc.*, 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002).

## B. **Plaintiffs' Summary Judgment Motion**

According to Plaintiffs, Amerigroup trained its marketing representatives to avoid pregnant women and people who were ill. Thus, Plaintiffs argue, Defendants violated 31 U.S.C. §§ 3729(a)(1) and (2) and the Illinois Whistleblower Reward and Protection Act by submitting false statements and claims to HFS and agencies of the United States in order to have false claims paid.

Plaintiffs claim that the scheme to defraud the United States and Illinois is evident from the preceding internal Amerigroup documents. Plaintiffs contend that the documents, taken with the deposition testimony, demonstrate that Defendants engaged in a systematic scheme to avoid enrolling pregnant women and other individuals who required more healthcare services in order to control costs. The scheme consisted of training marketing representatives to avoid enrolling pregnant women and sick individuals, closely monitoring marketing representatives to track which representatives followed the policy, and reprimanding those individuals who failed to comply. By avoiding patients with expensive medial needs, Plaintiffs contend, Amerigroup violated the FCA because it falsely promised not to discriminate in order to induce HFS to enter the contracts; falsely assured HFS of its

continued compliance; lied in its enrollment forms by implicitly certifying that it complied with the anti-discrimination policies and statutes; and submitted false certifications in Forms 37 and 64.

Defendants disagree about the meaning of the internal e-mails and memorandums. Defendants claim that when the documents are read in the proper context, they demonstrate that Amerigroup was concerned about continuity of care issues. *See, e.g.*, Pl. Ex. 35-36. Continuity of care issues arise when pregnant women, particularly in their third trimester, or persons who are ill, join Amerigroup and potentially interrupt the care they had been receiving. As a result, Defendants trained the marketing representatives to advise potential enrollees to remain with their current physicians until they completed their course of treatment. Defendants claim that their witnesses, including Paul Hardwick, the former Vice President of Marketing, testified he never trained marketing representatives not to enroll pregnant women. D. Ex. 33. In addition, Defendants point to Alvin Willis' testimony, the Marketing Director for Amerigroup Illinois from April 1999 through November 2002. Willis testified that he stressed continuity of care training, especially with regard to pregnant women. D. Ex. 16. Defendants argue that the documents and testimony demonstrate that Amerigroup was primarily concerned with the care and well-being of the individuals.

Based on the evidence contained in the record, a reasonable juror could conclude that Defendants' instructions and policies regarding third-trimester and ill enrollees demonstrated legitimate concerns about continuity of care issues. Thus, whether the policies and practices constituted impermissible discrimination or proper concerns is a question of fact for a jury to decide. Thus, summary judgment is improper and Plaintiffs' Motion is denied.

## C. Defendants' Summary Judgment Motion

Defendants move for summary judgment arguing neither the certification form nor the enrollment form constitute a claim under the FCA; they made no false statements under the FCA; any alleged false statement was not material to payment; and Plaintiffs cannot meet the scienter requirement because HFS knew of the marketing practices at issue.

## 1. Enrollment Forms Do Not Present Claim under FCA

Defendants argue that Plaintiffs cannot prove that the enrollment forms constitute "claims" for payment under the FCA because the forms do not request or demand immediate payment. Rather, Defendants argue, there are intermediate steps between the submission of the forms and government payment including that HFS must determine whether a particular enrollee is eligible and whether to enroll the individual.

According to the 1986 Amendments to the FCA, a claim under the FCA includes "any request or demand, whether under a contract or

otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money . . ." 31 U.S.C. § 3729(c).

Amerigroup focuses on the language in *U.S. v. Neifert-White, Co.*, 390 U.S. 228, 232 (1968) stating the claims must have had "the purpose and effect of inducing the Government *immediately* to part with money." (emphasis added). Plaintiffs argue that the enrollment forms constitute claims under the FCA because they initiate payment from HFS according to the terms of the contracts. Additionally, the forms are Defendants' last act to receive payment.

Defendants ignore the language in the 1986 Amendments and the holding in *U.S. ex rel Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (Dist. Col. Cir. 1995). In *Schwedt*, the Court held that under the FCA, a claim does not need to be an actual invoice because the statute "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 199 (citing *Neifert-White Co.*, 390 U.S. at 233). The court held that if the defendants submitted progress reports stating that its delivered products were complete, when in fact they were not, the reports constituted claims under FCA

- 12 -

because the goal was to receive payment and get the claim approved.
*Id.*

The fact that the enrollment forms did not result in immediate payment from the government is irrelevant. The enrollment forms constitute claims under the FCA because they were submitted in order to receive payment for the individuals who were ultimately enrolled.

Amerigroup also argues that the CMS forms HFS submitted to the United States on a quarterly basis for its share of the payments to the MCO's did not constitute claims under the FCA. Amerigroup argues that the forms did not contain a request or demand of payment or any immediate payment. The CMS forms submitted by HFS constitute a "request or demand . . . for money or property" and, as a result, the United States partially reimbursed HFS for its payments to Defendants. 31 U.S.C. § 3729(c). Thus, the CMS forms may constitute a claim under the FCA.

## 2. *Amerigroup Never Made Any False Statements*

Defendants argue that (1) there were no express false statements in the Section 5.11(a)(6) certifications and (2) there were no false statements in the enrollment forms. According to Plaintiffs, Defendants made false statements when they (1) promised in their contracts not to engage in discriminatory marketing; (2) assured HFS that it would not discriminate on the basis of health

- 13 -

status; and (3) submitted the quarterly certifications stating all allegations of fraud, abuse and misconduct were being reported.

a. *No Express False Statements in Certifications*

Defendants submitted quarterly fraud and abuse certifications to HFS reporting "all allegations of Fraud, Abuse, or misconduct of Providers, Beneficiaries, or Department Employees. . . ." The contracts define "abuse" as: " a manner of operation that results in excessive or unreasonable costs to the Federal and/or State health care programs." Pl. Ex. 2.

Defendants argue that HFS stated in a November 13, 2000 letter that the certifications did not apply to marketing and personnel issues. D. Ex. F. Therefore, they argue, they cannot be held liable for any alleged false statements in the certifications. Defendants' argument fails. As Plaintiffs point out, the letter referred to isolated incidents of inappropriate marketing conduct by individuals and did not excuse a comprehensive scheme to exclude certain groups from enrollment. If Defendants were systematically training marketing representatives not to enroll pregnant or sick individuals, that action may have constituted reportable fraud under the contracts.

b. *No False Statements in the Enrollment Forms*

Defendants argue that there were no false statements in the enrollment forms because Plaintiffs cannot show that Defendants were paid for services that Defendants did not provide. Plaintiffs

contend that the contractual promises not to engage in discriminatory marketing and the explicit assurances Defendants made to HFS following the contracts constitute false statements. In addition, every enrollment form contained an implicit representation of continuing compliance with the non-discrimination mandates.

Defendants argue that under the Fifth Circuit's decision in *U.S. ex rel Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375,381 (5th Cir. 2003), Plaintiffs cannot prove that claims contained false statements unless Defendants asked the Government to pay amounts it did not owe. In *Willard*, plaintiff alleged that defendants overcharged Medicare because it attempted to exclude individuals from certain counties. The court found that defendant's capitation rate was adjusted for each county. Therefore, the rates were not inflated by the exclusion of certain counties and defendant "accrued no unwarranted benefit and the government no loss by virtue of [defendant] enrolling more beneficiaries in some counties than others." *Id.* at 380. Further, the contracts in question did not obligate defendant to take affirmative steps to enroll beneficiaries in all counties. *Id.*

In this case, the alleged discrimination took place in one county, thus, the capitation rates would not have been adjusted to account for the exclusion of certain members of the population. Second, the contracts in question here, as well as the federal

- 15 -

statutes, obligate the defendants *not* to discriminate on the basis of health status. Finally, although Defendants may have provided health services to the individuals enrolled, false statements may have been made in order to procure the contracts and payments with HFS and the United States. *See U.S. ex rel Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005)("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."). Genuine issues of material fact preclude the court from granting summary judgment in either party's favor on the issue of whether Defendants made false statements.

### 3. *False Statements Were Not Material*

Defendants argue that summary judgment is appropriate because any alleged false statement was not material to payments made by either HFS or the United States. First, Defendants claim that HFS's failure to intervene in this action shows that any false statement was not material. Defendants argue that because HFS continues to contract with Defendants, any false statement must not be material. HFS' decision not to intervene, however, does not establish that the FCA was not violated or that any violation was immaterial. *See, i.e., U.S. ex rel King v. F.E. Moran, Inc.,* 00 C 3877, 2002 WL 2003219, at *11 (N.D. Ill. 2002)("the mere fact that the government chose not to intervene in this action in no way

demonstrates that it did not consider [defendant's] statements to be false.").

Defendants further contend that the certifications and compliance with the anti-discrimination laws and contractual provisions were not a condition of payment. Therefore, they contend, compliance could not have been material. Defendants argue that unless the information withheld from the government, in this case the alleged discrimination again third-trimester and ill enrollments, was "information critical to the decision to pay" the Plaintiff's claim is not actionable under the FCA. See *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1045 (N.D. Ill. 1998) (citation omitted)("the FCA is not a vehicle for regulatory compliance"); see also *F.E. Moran, Inc.*, 2002 WL 2003219, at *11 (holding that to succeed under an implied certification theory, plaintiffs must show that compliance with relevant statutes was a condition of receiving payment); *Willard*, 336 F.3d at 382-83 (Plaintiff lacked claim because compliance with regulations was not a condition of payment under the contract.). Finally, Defendants argue that the existence of contractual remedies for the alleged violations precludes a finding of materiality. See *Luckey*, 2 F. Supp. 2d at 1045.

In *Luckey*, Plaintiff alleged that a laboratory made false claims to the government in connection with its sales of plasma because it failed to perform certain testing procedures. *Id.* at

- 17 -

1041. The court held that government did not require the performance of the procedures and therefore they could not be a condition to payment. The court noted that Plaintiff failed to point to any regulation, statute or contract provision requiring Defendants to perform the procedures. Likewise, in *Willard*, the Fifth Circuit noted that there were no express certifications that defendants complied with any regulations. Further, the regulations were not mentioned in the contract. 336 F.3d at 383.

The question is whether Defendants would have been awarded the contracts and been paid or allowed to keep their contracts with HFS if HFS knew that they were discriminating against pregnant and ill individuals. *F.E. Moran*, 2002 WL 2003219, at *11; (citing *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999)) (suggesting that an omission must be "material to the United States' buying decision" to support liability under the FCA.). In this case, Plaintiffs point to specific contract provisions, correspondence with HFS, and statutes that require compliance with anti-discrimination policies. The record contains evidence that compliance with the statutes and provisions may have been material to the administration of and payment to an MCO.

With regard to Defendants' promises not to engage in discrimination prior to entering the contracts, Defendants ignore the Seventh Circuit's ruling in *U.S. ex rel Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005). In *Oakland City*

*University*, defendants made promises that induced the government to enter contracts. At the time the contracts were entered, defendants were engaging in conduct that violated those promises. The Seventh Circuit stated:

> The [FCA] requires a causal rather than a temporal connection between fraud and payment. (Citation omitted) If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.

*Id.* at 916.

Like *Oakland City*, if Defendants "knew about the [non-discrimination provisions and statutes] and told [HFS] that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act." *Id.* at 917. Defendants fail to show that non-compliance with the non-discrimination contract provisions and statutes were immaterial to HFS's payment under the contracts, and summary judgment is denied on this issue.

## 4. HFS Had Knowledge of Defendants' Marketing Practices

Defendants contend that Plaintiffs cannot prove a knowing submission of false claims because HFS knew about the initiative to reduce third-trimester enrollments. Specifically, Defendants contend they disclosed the initiative to reduce third-trimester enrollments in quarterly reports to HFS. The documents to which Defendants cite for support state that Amerigroup Illinois reported "opportunities" to reduce third-trimester enrollments, decreasing

- 19 -

third-trimester enrollments and success in reducing such enrollments.

Defendants rely on *U.S. ex rel Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999). *Durcholz* held that "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *Id.* at 544-45. In *Durcholz,* the government sought to hire a contractor to dredge a sedimentation pond at a military facility. The project needed to be completed quickly. To speed the process, a facility official instructed the contractor to submit invoices for excavation work, instead of for dredging work, which the officer knew was the work the contractor had actually completed. The plaintiff alleged that the contractor's compliance with such instructions violated the FCA. The Seventh Circuit disagreed and refused to hold the defendant "liable for defrauding the government by following the government's explicit directions." *Id.*

The facts in *Durcholz* differ from the evidence presented here. The quarterly statements that were submitted to HFS are not enough to establish that HFS had knowledge of a comprehensive marketing initiative or scheme, if one existed, to reduce or avoid the number of third-trimester or expensive enrollments. Taken alone, the

- 20 -

statements may have communicated that Defendants were concerned about continuity of care and had no discriminatory motive in reducing such enrollments. Further, Defendants do not sufficiently establish who, if anyone, at HFS reviewed these reports. Whether the statements show that HFS had knowledge of Defendants' practices is a question of fact for the jury.

## III. CONCLUSION

For the reasons stated herein, the parties' Cross-Motions for Summary Judgment **are denied**.

**IT IS SO ORDERED**.

Harry D. Leinenweber, Judge
United States District Court

Dated: September 13, 2006

- 21 -