IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, *ex
rel.* CLEVELAND TYSON; the
STATE OF ILLINOIS, *ex rel.*
CLEVELAND TYSON; and THE
PEOPLE OF THE STATE OF
ILLINOIS,

              Plaintiffs,

     v.

AMERIGROUP ILLINOIS, INC. and
AMERIGROUP CORPORATION, INC.,

              Defendants.

Case No. 02 C 6074

Hon. Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

Relator Cleveland Tyson (hereinafter, "Tyson") filed this *qui tam* action under the False Claims Act (the "FCA"), 31 U.S.C. § 3729(a)(1) & (2), and the Illinois Whistleblower Reward and Protection Act (collectively, "the FCAs"), 740 ILCS 175/1, *et seq.*, against Defendants Amerigroup Illinois, Inc. (hereinafter, "AI") and Amerigroup Corporation, Inc. (hereinafter, "AC"). Tyson alleged that Defendants defrauded the United States and the State of Illinois by engaging in discriminatory marketing practices in the course of conducting a Medicaid HMO. After several weeks of trial, a jury found for Plaintiffs.

## I. BACKGROUND

Only a very basic factual background will be set forth here. Additional facts will be provided as necessary.

## A. The False Claims Acts

The FCA permits private persons to file a form of civil action against, and recover damages on behalf of the United States, from any person who:

>     (1) knowingly presents or causes to be presented, to an officer or employee of the Unites States Government . . . a false or fraudulent claim for payment or approval;
>
>     (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. §§ 3729(a)(1)-(2). To state a claim under the FCA, plaintiffs must show that (1) defendants presented a claim for payment; (2) the claim was false; and (3) defendants knew the claim was false. 31 U.S.C. §§ 3729(a)(1)-(2). The Illinois Whistleblower Act is virtually identical. 740 ILCS 175/1 et seq.; *see also U.S. ex rel. Humphrey v. Franklin-Williamson Human Services, Inc.*, 189 F.Supp. 2d 862, 867 (S.D. Ill. 2002).

## B. Facts

At trial, Plaintiffs presented two liability theories. Under the first theory, Plaintiffs argued that Defendants fraudulently induced the IDPA to enter into contracts by promising not to discriminate based on the need for health services, even though it had no intention of keeping that promise. This misrepresentation made Defendants ineligible to contract with the IDPA and receive Medicaid funds. As such, all contracts at issue violated the FCAs.

Under the second theory, Plaintiffs argued that Defendants submitted false claims for payment, the enrollment applications (containing implied certifications), causing the State of Illinois to submit forms CMS-37 and CMS-64 (containing false express certifications) to the Federal Government. Because capitation rates were based on Defendants' promise that they would not discriminate, Defendants' discrimination undermined the actuarial basis for the capitation rates that IDPA paid to Defendants. By misrepresenting that it would not discriminate, Defendants knew that it would receive inflated capitation payments. As such, each enrollment form constituted a false claim because it sought the payment of capitation rates that Defendants knew were inflated. When the IDPA submitted the CMS-37 and CMS-64 forms, it certified that the expenditures were in compliance with federal laws and regulations; these certifications were likewise false.

The jury found for Plaintiffs in the amount of $48 million in government damages. Additionally, the jury's responses to special verdict forms evidenced agreement with both liability theories. The jury also found that there were 18,130 false claims; this interrogatory was asked purely for purposes of determining the applicable civil penalties. This interrogatory was not "upon one or more issues of fact the decision of which is necessary to a verdict," as the jury need not determine the number of false claims

to return a verdict under the FCA.  *See* FED. R. CIV. P. 49(b).
Thus, it was not a special interrogatory.  *Id.*

## II.  <u>STANDARD</u>

Judgment as a matter of law must be granted where "no reasonable jury could have found for [plaintiffs] on each essential element of their claim." *Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005).  This is a stringent standard, *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586 (7th Cir. 1986); "any conflicts in the evidence must be resolved in favor of the resisting party, and every permissible inference favoring that party which can be drawn from the evidence must be drawn." *Pieczynski v. Cerda,* 1988 WL 67646 at *1 (N.D. Ill. June 20, 1988).

When a motion for judgment as a matter of law is based on an insufficient evidence argument, a court must decide whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000). The motion must be denied if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Mathur v. Board of Trustees of Southern Illinois University*, 207 F.3d 938, 941 (7th Cir. 2000).  If a rational jury could have found

for the plaintiff, then the court must uphold the verdict. *Id.* at 941.

This Court must grant a new trial where "the clear weight of the evidence is against the jury verdict, the damages are excessive or for some other reason the trial was not fair." *Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290, 1293 (7th Cir. 1993). This standard requires a court to accord "the jury's verdict great deference." *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994). A jury's verdict cannot be overturned if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight to the jury. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). Where a jury instruction is at issue, a party is entitled to a new trial if the Court finds that "(1) the instruction inadequately states Seventh Circuit law; and (2) the error likely confused or misled the jury causing prejudice to the movant." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000).

### III. AMERIGROUP ILLINOIS' MOTION FOR JUDGMENT AS A MATTER OF LAW/MOTION FOR NEW TRIAL

#### A. Fraudulent Inducement Theory

Under their first liability theory, Plaintiffs contended that AI fraudulently induced the IDPA to enter into a contract by (1) signing the 2000 MCO Contract (which included a marketing

restriction against health-based discrimination) and (2) stating in a April 30, 1999 letter that "AMERICAID will not discriminate against clients with health issues which includes pregnant women."

### 1. *Actionable False Statements*

Initially, AI asserts that its express (but false) assurances that it would comply with the non-discriminatory marketing requirements are not actionable under the FCA. As this Court held in the summary judgment opinion, *U.S. ex rel. Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005) precludes AI's argument. Under *Oakland City*, Plaintiffs must show that (1) the non-discrimination provisions were prerequisites to participation in the Medicaid HMO program under federal law; (2) AI knew when it signed the 2000 MCO Contract with the IDPA that discriminatory marketing practices were forbidden; and (3) AI planned to utilize discriminatory marketing practices. AI argues that Plaintiffs attempt to premise FCA liability on the mere breach of contract or violation of regulations, but this is not the case (as made perfectly clear in *Oakland City*). "[M]aking a promise that one intends not to keep is fraud" and actionable under the FCA; an after-the-fact breach of a contract – that was not planned at the time the contract was entered into - is just that: a breach. *Oakland City*, 426 F.3d at 917. AI's attempts to distinguish *Oakland City* are likewise misguided.

AI also asserts that the false statement needed to have been a "condition to payment" and that this Court should read a "directness" requirement into the FCA which "demand[s] some direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). A condition to participation is a condition to payment, *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)(reasoning based on Seventh Circuit's opinion in *Oakland City*), and Plaintiffs presented sufficient evidence for a reasonable jury to have found that the non-discrimination provisions were conditions to participation. "If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Oakland City*, 426 F.3d at 916. The requested "directness" requirement, furthermore, has been drawn by AI from case law outside the FCA context. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1996 (2006)(RICO). The mere fact that the Supreme Court has read such a requirement into other statutes is not sufficient justification for this Court to read it into the FCA.

## 2. *Evidence of Inducement*

AI also contends that Plaintiffs failed to present sufficient evidence that false statements actually induced the IDPA to enter into contracts because Plaintiffs did not present an "affirmative

statement" that so indicates. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996). *Hopper*, however, only requires that the jury have found that "the false statement is the cause of the Government's providing the benefit" – or that the non-discrimination provisions are prerequisites to participation in the Medicaid program and AI falsely indicated it would comply. *Id*.

*Oakland City* never mentions this "affirmative statement" requirement. Plaintiffs introduced evidence at trial to satisfy the *Oakland City* standard: (1) the nondiscrimination provisions were prerequisites to participation in the Medicaid HMO program under federal law, *see* 42 U.S.C. § 1396(m)(2)(A)(v); (2) that AI knew about the nondiscrimination provisions and statutes and told IDPA that it would comply with them; and (3) that Amerigroup planned to violate (and was already violating) the non-discrimination provisions. It is thus this Court's belief that sufficient evidence was presented at trial to meet the *Oakland City* requirements for fraudulent inducement.

## B. Implied Certification Theory

### 1. Materiality

#### a. Materiality Standard and Sufficiency of Evidence

Defendants contend that the non-discrimination provisions were not material because they were not a condition to payment under the IDPA contract. Plaintiffs assert that they met the materiality requirement as previously described by this Court.

At summary judgment, Defendants argued that unless the information withheld from the government was "information critical to the decision to pay," they were not liable under the FCA and that the existence of contractual remedies for the alleged violations precluded a finding of materiality. This Court held that "the question is whether Defendants would have been awarded the contracts and been paid or allowed to keep their contracts with HFS if HFS knew that they were discriminating against pregnant and ill individuals" and distinguished the cases on which AI still relies. *U.S. ex rel. King v. F.E. Moran, Inc.*, 2002 WL 2003219 at *11 (N.D. Ill. Aug. 29, 2000)(citing *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999)). As such, Plaintiffs are not required to prove that the false claims were "information crucial to the decision to pay" or identify a federal regulation that "*expressly* state[s] the provider must comply in order to be paid." *Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001)(emphasis added).

The jury heard evidence that AI's promises not to discriminate were material because AI would not have been awarded the contracts without them. The Ninth Circuit has held that "a condition to participation is a condition to payment," as "if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all." *Hendow*, 461 F.3d at 1174-76; *see also S. Rep. No. 345, 99th Cong., 2d Sess.* at 9,

- 9 -

reprinted in 1986 U.S.C.C.A.N. 5266, 5274 ("claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program."). Plaintiffs presented evidence that the federal government could not have approved the 2000 contract absent these promises. Additionally, the nondiscrimination provisions were material because they formed the actuarial basis upon which capitation rates were calculated. Plaintiffs further assert that the enrollment forms were material to IDPA's payments because their submission, which impliedly certified compliance with the non-discrimination provisions of the contract, triggered the government's inflated payments. Additionally, the IDPA's certification of compliance with applicable laws and regulations (false because of AI's conduct) was material to the United State's decision to pay.

The parties disagree as to the meaning of former IDPA Bureau Chief of Contract Management Kelly Carter's (hereinafter, "Carter") testimony. Defendant claims that Carter's testimony that had she (and the IDPA) been aware of AI's marketing practices, the IDPA would have "taken the opportunity to reeducate them" rather than terminate the contract indicates that the materiality requirement was not met. Plaintiffs assert that Carter's testimony was not so clear; in fact, Carter testified that she would also have gone to her supervisors to let them know what was happening and seek direction on how to proceed. It is this Court's opinion that,

regardless, there was sufficient evidence for a reasonable jury to have concluded that the materiality element was met.

### b. Materiality Instruction

AI argues that it is entitled to a new trial because the jury was not properly instructed on the implied certification theory's materiality element.  Instruction 32 stated:  "Fourth:  that the false claim or statement involved facts that were material to the government's payment."  Defendants assert that an instruction explaining that AI's implied certificate of compliance with the non-discrimination duties needed to be a precondition to IDPA's payment in order for liability to attach, and that the given instruction gave the jury no guidance as to what the claim was and whether the claim "involved facts" that were "material" to payment.

This Court believes that the jury instruction was proper as given.  Other courts have considered "materiality" a concept that has a clear enough meaning that it need not be defined in the jury instructions.  *U.S. v. Castillo*, 406 F.3d 806, 821 n.6 (7th Cir. 2005); *U.S. v. Matsumaru*, 244 F.3d 1092, 1102-03 (9th Cir. 2001); *U.S. v. Blasini-Lluberas*, 169 F.3d 57, 67 (1st Cir. 1999).  When reviewing a challenge to a jury instruction, furthermore, a court "must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record.'"  *Sims v. Mulcahy*,

902 F.2d 524, 533 (7th Cir. 1990). There was testimony at trial that the government could not have contracted with AI if it did not promise not to discriminate based on health status and that the non-discrimination provisions were integral to determining the level of capitation rates paid to AI – as such, there should have been no confusion.

### C. Rulings Regarding the Enrollment Forms

To be liable under the FCA, a defendant must submit a false claim: "any request or demand . . . for money or property . . . made to a contractor, grantee, or other recipient if the United States Government provides any . . . of the money or property . . . requested or demanded, or if the Government will reimburse any . . . recipient for any portion of the money . . ." 31 U.S.C. § 3729(c).

### 1. The Enrollment Forms as Claims

AI argues that enrollment forms cannot be claims because they do not demand payment and do not have the purpose of inducing the Government to immediately part with money. *See* 31 U.S.C. § 3729(c); *U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). These arguments were rejected in the summary judgment opinion; the enrollment forms are claims because they were "submitted in order to receive payment," even if payment was not immediate.

AI also argues this Court erred in instructing the jury that the enrollment forms constituted claims. As Plaintiffs point out,

however, whether the enrollment forms were claims was a legal issue determined at summary judgment.  Therefore, an instruction that the forms were claims was not improper, and Plaintiffs need not have presented evidence at trial that the enrollment forms were claims.

## *2.  Falsity*

### *a.  Lack of a Falsity Instruction*

AI argues that the Court erred by failing to instruct the jury how to determine if the enrollment forms (the claims) were false, and that by failing to give the jury such an instruction, the Court implied that each claim was false.  It is not error to fail to give the definition of a statutory term where the term "carries its natural meaning and that meaning is accessible to all jurors." *Castillo*, 406 F.3d at 821.  It appears to this Court that "false" carries its natural meaning and that this meaning would be accessible to the jurors.  Instructions 31 and 32, furthermore, required the jury to find that AI submitted false claims.

### *b.  Evidence of Falsity*

Defendants argue that there was insufficient evidence that the enrollment forms were false, as the Plaintiffs admitted that the forms were true and accurate on their face.  Plaintiffs advanced two theories that the forms were false:  (1) the forms purportedly included implied certifications that AI was not engaging in health-status discrimination and (2) the forms sought inflated capitation payments based on AI's certification that it would not discriminate

against pregnant women and "unhealthies."  This Court believes that there was sufficient evidence presented for a reasonable jury to determine that the enrollment forms were false.  Plaintiffs showed that the forms included implied certifications that it was complying with the contracts.  *See Oakland City*, 426 F.3d at 916 ("the phase-two application is itself false because it represents that the [enrollee] is enrolled in an eligible institution, which isn't true").  Plaintiffs also showed that AI's promises of non-discrimination were integral to payment because they formed the actuarial basis for the capitation rates and that by illegally excluding pregnant women and "unhealthies," AI undermined the basis of these capitation payments.  Plaintiffs, furthermore, showed that AI submitted enrollment forms requesting inflated capitation payments – payments to which it knew it was not entitled because it was engaged in discriminatory marketing practices not permitted under the IDPA contract.

Defendants argue that because the enrollment forms do not explicitly demand any particular amount of capitation-based payments, there was insufficient evidence of falsity.  As this Court stated in the summary judgment decision, "a claim does not need to be an actual invoice."  *U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995).  Defendants also argue that Plaintiffs failed to show that AI's enrolled population was actually "more healthy" than that on which the capitation rates

were based.  The enrollment forms impliedly certified that AI was complying with the contract terms; as AI was not (and the falsity is in the implied certification), Plaintiffs need not show the relative healthiness of AI's enrolled population.

### 3. Presentment to the Federal Government

The Federal FCA extends only to claims that are presented to "an officer or employee of the United States Government." 31 U.S.C. § 3729(a)(1), (a)(2).  This Court has already held that claims submitted to state Medicaid agencies or intermediaries are considered to be claims presented to the federal government and can give rise to liability under the FCA.  *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 2005 WL 2667207 at *1-3 (N.D. Ill. Oct. 17, 2005).  AI argues that a new trial is necessary because Plaintiffs failed to show that the enrollment forms were submitted to the Federal Government.

Plaintiffs presented sufficient evidence of presentment. Plaintiffs showed that the IDPA submitted CMS-37 and CMS-64 forms to the federal government in order to obtain reimbursement for HMO-related expenses.  The IDPA indicated the amount it anticipated to incur in HMO-related expenses on each CMS-37 and the amount it had actually paid on each CMS-64.  These amounts were based on enrollment forms submitted by AI.  AI's arguments that it did not cause these forms to be submitted or know that they would be submitted are frivolous.  As a seasoned Medicaid participant, AI

had to have been aware that the IDPA would seek reimbursement from the federal government for the claims.

AI argues that the implied presentment by the IDPA is insufficient as a matter of law because the IDPA submitted aggregated total expenditure tallies based in part on AI's enrollment forms rather than the forms themselves.  In the motion to dismiss decision, this Court noted that "the federal government ultimately approved the purportedly false Medicaid claims *processed and submitted* by the IDPA."  The practical effect of AI's argument would require that the IDPA submit thousands of enrollment forms to the federal government - rather than aggregate the same information into a single tally - solely to preserve future FCA actions. Although the Eastern District of Louisiana has ruled differently, this Court cannot see why aggregation by a State agency alone should foreclose federal FCA liability.  *See, U.S. ex rel. Rafizadeh v. Continental Common, Inc.*, 2006 WL 980676 (E.D.La. Apr. 11, 2006).  This is not, after all, a case in which the false claims have been aggregated into a general budget or otherwise obscured; instead, they have been aggregated in such a way so as to cut down on the transmission of reams of paper.

AI also argues that the jury's response to the number of claims interrogatory did not include the CMS-37 and CMS-64 forms the IDPA submitted to the federal government, and thus, a reasonable jury could have found that these forms were presented to

the federal government.  This argument is beside the point; the interrogatory regarding the number of false claims cannot be used to impeach the verdict because it was not a special interrogatory.

### D.  Government Knowledge and Contract Interpretation Rulings

#### 1. *Government Knowledge*

AI argues that the jury was improperly instructed regarding the effect of government knowledge on liability.  The FCA requires proof of "knowing" violations.  31 U.S.C. § 3729(b).  AI asserts that a party cannot knowingly violate the FCA if the government knew about the conduct on which the false claims counts are based. Plaintiffs contend that the test requires that the government both know of *and approve* the conduct.  The instruction stated:

Knowledge of Falsity

> No proof that Defendants had specific intent
> to defraud the United States or State of
> Illinois is required.  A claim based on the
> Defendants' . . . good faith belief that the
> government approved the conduct at issue is
> not a claim that violates the False Claims
> Act.

The Seventh Circuit addressed government knowledge in the FCA context in *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  In *Durcholz*, a subcontractor submitted a bid which followed the government's instructions – instructions that made it technically false.  *Id.* at 543-45.  Because the government instructed the subcontractor to draw up the bid in a false manner, the Seventh Circuit held that the FCA did not apply.  *Id.*  Although

some language supports AI, the critical language and the facts indicate that the proper test is whether "the government knows and approves of the particulars of a claim for payment before the claim is presented." *Id.* at 545. This Court has noted that mere acquiescence (rather than approval) by government employees is not sufficient to avoid liability, as requiring mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots. *U.S. ex rel. Asch v. Teller, Levit & Silvertrust, P.C.*, 2004 WL 1093784 at *3 (N.D. Ill. May 7, 2004). Defendants also cite to *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999), but the decision there rested on the falsity's immateriality; any commentary regarding government knowledge was *dicta*.

If the test to avoid liability is whether the government both knew and approved Defendants' discriminatory marketing practices, then the jury instruction given, holding Plaintiffs to an even more rigorous showing than required by law, was not prejudicial.

### 2. *Contract Interpretation*

#### a. *AI's Reasonable Interpretation of the Contract*

A defendant cannot be held liable under the FCA for conduct based on the reasonable, but incorrect, interpretation of a contract. *U.S. v. Basin Elec. Power Co-op.*, 248 F.3d 781, 792 (8th Cir. 2001); *U.S. ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 329 (9th Cir. 1995). AI argues that it presented

"uncontradicted" evidence that its conduct was consistent with a reasonable interpretation of the non-discrimination provisions in the IDPA contracts. However, there was ample evidence that AI purposely avoided "unhealthies" and pregnant women and was motivated by profit in doing so – evidence that contradicts the evidence that AI's conduct was consistent with reasonable contract interpretation. As such, this Court finds that a reasonable jury could have found that AI's discrimination was not based on a good faith interpretation of the contract.

### b. *Contract Interpretation Jury Instruction*

AI also argues that the jury instruction regarding contract interpretation was improper. This Court gave an instruction which stated the applicable law: "A claim based on Defendants' good faith interpretation of the contract . . . is not a claim that violates the False Claims Acts." AI's proposed instruction tied the contract interpretation defense to the contract's non-discrimination provisions. Although there was evidence at trial regarding several contractual provisions, there could be no legitimate confusion as to which provisions were relevant. AI, furthermore, could have highlighted these provisions in relation to the contract interpretation defense for the jury during closing arguments.

### E. Discovery and Evidentiary Rulings

#### 1. IDPA's Letter to Humana (DX 32)

AI argues that this Court erred in several evidentiary rulings related to a letter, DX 32. DX 32 was written by May Meredith ("Meredith") for Nelly Ryan's ("Ryan") signature and sent to Humana, an MCO that had the same contract as AI. The letter stated that

> "only eligible enrollees in Cook County may be enrolled and should not be discriminated against based on health status. Pregnant women or persons undergoing a course of treatment under the care of a non-affiliated physician should be advised that they should remain with their current physicians until they deliver or their course of treatment is completed. It is very important that pregnant women receive their prenatal care and receive continuity of care throughout their pregnancy."

The letter was admitted into evidence, but Meredith was not allowed to testify because she was "too attenuated" – she had admitted that she was not trained in IDPA's policy regarding enrolling pregnant women. AI argues that Meredith was not, in fact, attenuated because she wrote the letter and attended the Humana training. This Court maintains that although she attended the meeting and took notes, she was not trained in the IDPA policy. AI, furthermore, was able to present testimony regarding the letter from two IDPA witnesses, Kelly Carter and Debbie Saunders.

Additionally, AI argues that this Court erred by preventing AI from soliciting testimony regarding DX 32 but permitting Plaintiffs

to do so.  This Court disagrees; AI ignores that it presented the jury with testimony from five witnesses regarding the letter, including two from the IDPA.

### 2. *IDPA Discovery*

Early in this case, a magistrate judge ruled that the IDPA was a separate and distinct entity over which neither the State nor the Attorney General's office had control and whose documents could not be deemed in the State's possession, custody, and control for the purposes of discovery.  As such, IDPA was treated as a third party.  AI asserts that this decision severely prejudiced its ability to take probative discovery from the IDPA on the issue of government knowledge, and that this Court need not "stick to a particular ruling if it is convinced that [its prior decision] is clearly erroneous and would work a manifest injustice."  *Agostini v. Felton*, 521 U.S. 203, 236 (1997).  This Court has, *ad nauseum*, addressed this issue and applied the law of the case.  It will not reverse that decision now.

### F. Damages

### 1. *Mr. O'Brien's Testimony*

Defendants assert that Plaintiffs' damages expert, Mr. Kevin O'Brien, was improperly admitted.  Mr. O'Brien set forth four different ways to quantify the government's damages:  (1) a comparison of comparing AI's medical loss ratio (the "MLR") to the MLRs of a peer group; (2) a comparison of AI's birthrate to the fee

for service birthrate; (3) third trimester births; and (4) damages for women and young children based on the new August 2003 rate structure. Although Defendants' earlier objections addressed all four of these damage estimates, the post trial motion primarily concerns the MLR comparisons.

### a. Admissibility under Daubert

AI asserts that Mr. O'Brien's testimony was improperly admitted under Federal Rule of Evidence 702 and *Daubert*. Rule 702, as informed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), "assigns to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).

### i. Relevance of Mr. O'Brien's Damages Estimates

AI argues that Mr. O'Brien's estimate of damages did not "assist the trier of fact" and should have been excluded as irrelevant. Under the FCA, Plaintiffs are entitled to the amount of damages "which the Government sustains because of . . . [Defendants'] act." 31 U.S.C. § 3729(a). The proper measure of damages is thus the difference in the market values between what the government actually received and what it would have received but for the false claim. *U.S. v. Bornstein*, 423 U.S. 303, 316 n.13 (1976).

In his MLR comparison, Mr. O'Brien calculated the loss to the government by estimating the additional costs foisted on the state for each person Defendants avoided enrolling. Because no records were kept of the avoided persons, Mr. O'Brien was not able to calculate the loss associated with the avoided persons (although one method attempted to do so). Thus, Mr. O'Brien used the data that he did have – AI's MLR and the MLRs for a selected "peer group." By comparing the MLRs, Mr. O'Brien arrived at an estimate of the government's losses due to Defendants' discriminatory marketing practices.

AI argues that Mr. O'Brien's method of assessing damages is tantamount to requesting that AI disgorge its profits (because MLRs are a measure of profits). Disgorgement of profits is not a remedy recoverable under the FCA. *U.S. ex rel. Taylor v. Gabelli*, 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005). This Court does not believe that Mr. O'Brien's method of assessing damages constituted disgorgement of profits. Notably, Mr. O'Brien did not calculate the profits obtained by AI and claim that these were the government's damages, but rather compared AI's profit margin to the profit margin of a group of other MCOs. Thus, O'Brien presented the government's damages as the difference between the profit margin of an MCO engaged in fraudulent marketing discrimination and a peer group of MCOs not engaged in fraudulent marketing discrimination. This measure of damages forces AI to disgorge the money the government

would not have paid had it known AI was discriminating (assuming that AI's additional profit constituted the market value of payments for discriminated-against persons).

AI also argues that Mr. O'Brien's theory of damages is irrelevant because it is not tied to the number of enrollment applications submitted by AI. The parties agree that liability attaches when a false statement is used "to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2). Under their false claims theory, Plaintiffs argued that each enrollment form was false because it contained an implied false certification that AI was complying with the required nondiscrimination policy and that capitation rates were calculated based on this certification. As such, AI sought inflated capitation rates in each enrollment form. Mr. O'Brien's damages estimate seeks to recover, for the government, the extent to which these capitation payments were inflated.

Additionally, Plaintiffs remind this Court that in cases where a Defendants' bad acts have made calculation of damages difficult, the law eases the standards for damage measurement. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1963). It would have been nearly impossible for Plaintiffs to provide an accurate calculation of damages based on the fact that AI walked away from pregnant and "unhealthies" before ever signing

them up – and thus leaving no paper trail for Plaintiffs to convert into a more accurate damages calculation.

### ii. Reliability

Before admitting expert testimony, a court must assess the reliability of that testimony. *Daubert*, 509 U.S. at 593-94; *U.S. v. Conn*, 297 F.3d 548, 555-57 (7th Cir. 2002). A court must "reject any subjective belief or speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

It is important to remember that neither the Federal Rules of Evidence nor *Daubert* require that expert witness testimony be "'scientific' (natural scientific or social scientific) in character"; a person with "relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Thus, to the extent that AI argues that Mr. O'Brien's testimony is unreliable because it is not statistical, AI is wrong.

AI objects to the fact that Mr. O'Brien selected his comparison group of MCOs rather than using a randomly selected peer group. Mr. O'Brien's peer group included other AC plans (because he believed that certain programs at AC would affect the way in which each of the Amerigroup plans operated), other plans operated in Cook County, and a Nevada and South Carolina plan. Mr. O'Brien explained that he eliminated commercial plans (plans "like I would

buy my insurance through" as opposed to Medicaid programs),
provider sponsored plans (plans "where there is a group of
hospitals that have an interest in a health insurance plan"), and
primarily, plans operating in mandatory states. (Apparently, Mr.
O'Brien believed that Nevada was a mandatory state when he selected
his peer group, and later discovered he was incorrect.
Nevertheless, Plaintiffs assert that the inclusion of this
mandatory group helped Defendants by lowering Mr. O'Brien's damages
estimates.)  This Court does not believe that Mr. O'Brien's method
of selecting his comparison group was based merely on subjective
beliefs or speculation.  Instead, Mr. O'Brien appears to have (to
the best of his ability) reasonably eliminated MCOs that were
differently situated from AI.  The conclusions as to difference
were based on articulable standards and on Mr. O'Brien's experience
in the MCO business – hardly speculation.

Defendants argue that Mr. O'Brien made no attempt to adjust
for "major systemic differences" between AI and the peer group.  As
an initial matter, Mr. O'Brien did adjust for some of the variables
cited by AI, including operating in mandatory states (although he
made  a mistake regarding the Nevada plan), having ownership of
their own clinics (provider-sponsored plans), and different
Medicaid products and different Medicaid programs by states
(variables accounted for by the differing capitation rates).
Plaintiffs and Mr. O'Brien admit that he did not account for the

following variables in selecting his comparison group: negotiating different provider rates, having state-controlled MLRs or earnings, and achieving different degrees of health care management. The mere fact that Mr. O'Brien failed to consider some variables (that AI wishes he did) is not sufficient to find his methods unreliable under *Daubert*. *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 423 (7th Cir. 2000); *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 693 ("an expert's causation conclusion should not be excluded because he or she has failed to rule out *every* possible alternative cause.").

Lastly, AI argues that Mr. O'Brien improperly deducted two standard deviations from the mean to reach a lower damages estimate. Mr. O'Brien explained that he deducted the standard deviations to account for factors that might have contributed to the difference between AI's MLR versus the peer group's MLR. Mr. O'Brien testified at trial that this was not a necessary step in calculating damages. If all Mr. O'Brien was trying to do was provide a more conservative damages estimate, and this benefitted AI, this Court does not believe that it would render his methodology so unreliable as to be inadmissible under *Daubert*.

## 2. *Proof of Harm to the Government*

Defendants contend that judgment as a matter of law should be entered in their favor because Plaintiffs failed to prove that the government was harmed by AI's conduct. Specifically, Defendants

assert that Plaintiffs did not establish that the relative health/birthrates IDPA was entitled to receive differed from the relative health/birthrates in AI's enrollment. Defendants cite no cases that require such a showing. Plaintiffs, however, contend that they met their burden by showing the discrepancy between AI's MLRs and the MLRs of AI's peer group, and that the jury heard evidence that AI had lowered its medical costs by avoiding pregnant women and other unhealthies. This Court believes that Plaintiffs presented evidence from which the jury could have concluded that the government was harmed – the discrepancies between the MLRs of AI and AI's peer group.

### 3. The Exclusion of Defendants' Expert

AI further contends that this Court erred by barring Mr. Monical's testimony. Mr. Monical sought to testify that enrolling pregnant women is profitable if one considers the mother's entire family. According to AI, Plaintiffs thus were able to exploit the myth that pregnant women are unprofitable, and a new trial should be ordered. In ruling on the motion in limine, this Court concluded that Mr. Monical's testimony was a *post hoc* rationalization of AI's actions – AI performed the profitability analysis only three years into this lawsuit. This Court still believes that the testimony was irrelevant. If AI did not know that enrolling pregnant women was, in fact, profitable, then this fact should not have been considered by the jury.

## IV.  AMERIGROUP CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW/MOTION FOR NEW TRIAL

### A.  Verdict "Inconsistency"

AC argues that it is entitled to judgment as a matter of law because the jury indicated that only AI submitted false claims in answering the number of claims interrogatory.  As noted above, this interrogatory was not a special interrogatory, and thus cannot be used to impeach a general verdict.  FED. R. CIV. P. 49, 58.

### B.  Jury Instructions

AC asserts that it is entitled to a new trial because the jury instructions regarding its liability were erroneous and prejudicial. The following instructions regarding AC's liability were given:

Instruction No. 31:

> In order to sustain Plaintiff's burden of proof for its claims against Amerigroup Corporation on its theory of fraudulent inducement, Plaintiffs must prove, by a preponderance of the evidence, that Amerigroup Corporation actively participated in the fraudulent conduct which fraudulently induced the government to enter into the Contract.

Instruction No. 32:

> "In order to sustain Plaintiffs' burden of proof for its claims against Defendants Amerigroup Corporation on its theory of submission of false claims, Plaintiffs must prove, by a preponderance of the evidence, that Amerigroup Corporation actively participated in the fraudulent conduct which caused the false claims to be submitted."

(Both Instructions No. 31 and No. 32 began by explaining that the jury must find that Plaintiffs had satisfied their burden as to each element of FCA liability as against AI, and then concluded with the excerpts reproduced above.)

Defendants argue that the "active participation" standard is legally incorrect. Plaintiffs assert that the "active partici-pation" standard accurately states the law and alternatively that the instructions, when viewed in their entirety, required the jury find all four elements of the FCA as against AC.

As an initial matter, Plaintiffs assert that AC has waived its objection. Under Federal Rule of Civil Procedure 51(c)(1), a party must object to an instruction on the record, stating distinctly the matter objected to and the grounds of the objection. *Sims*, 902 F.2d at 535; *Emmel v. Coca-Cola Bottling Co. of Chicago*, 904 F.Supp. 723, 743 (N.D. Ill. 1995). Such objection "must be specific enough that the nature of the error is brought into focus." *Schobert v. Illinois Dept. Of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002). Plaintiffs argue that the objection lodged by AI's attorney, Mr. Sterling, is inadequate because it complains of the interrogatories, not the instructions. Mr. Sterling's objections were sufficient. He objected to the "active participation" standard's vagueness and its failure to account for all the FCA elements with regards to the questions. The Court indicated that it understood that this objection recapped an

argument already waged and lost. Mr. Sterling also clearly objected to Instruction Nos. 31 and 32. These statements were nowhere near as deficient as those in *Emmel* (where the record gave no indication of basis of the objection whatsoever) and *Sims* (where the objection never mentioned the basis of the later appeal). As in *Schobert*, this Court believes that Mr. Sterling's objection "alert[ed] the district court to the pertinent areas of disagreement." *Schobert,* 304 F.3d at 729.

The objections, however, were made by AI's attorney, Mr. Sterling, and Plaintiffs claim that this preserved only AI's objection. Defendants were jointly represented prior to trial, but AC obtained separate counsel shortly before the trial began. Defendants explained "this is the way the clients would like to be represented. They feel . . . that this is in their best interest." Regardless, AI and AC submitted only one set of consolidated proposed jury instructions and objections. The Seventh Circuit has not addressed this point, but the Eleventh Circuit has held that a co-defendant's objection is not sufficient as to other defendants. *Kenney v. Lewis Revels Rare Coins*, *Inc.*, 741 F.2d 378, 382 (11th Cir. 1984). The Second, Fifth, and Ninth Circuits, however, have held that an otherwise sufficient objection by a co-defendant preserves a party's objection where "further exception would have been fruitless." *U.S. v. Lefkowitz*, 284 F.2d 310, 313 n.1 (2d Cir. 1960); *U.S. v. White*, 589 F.2d 1283, 1290 n. 14 (5th Cir. 1979);

*U.S. v. Bagby*, 451 F.2d 920, 927 (9th Cir. 1971). Given that AI and AC jointly submitted instructions and objections, this Court finds that additional objection by AC would have been fruitless – and finds that AC preserved its objection.

The "active participation" standard is an accurate statement of the law, as a defendant who actively participates in the knowing submission of false claims is liable under the FCA. *U.S. v. President and Fellows of Harvard College*, 323 F.Supp.2d 151 (D. Mass. 2004); *U.S. ex rel Sikkenga v. Regence BlueCross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006). "The FCA covers 'indirect mulcting of the government'" and "a defendant may be liable if it operates under a policy that causes others to present false claims to the government." *Harvard College*, 323 F.Supp.2d at 187. In *Harvard College*, an FCA action alleged that Harvard and two employees had submitted false claims by making false certifications that all requirements of a grant had been complied with. *Id.* at 187-89. As it turned out, the two employees had made investments that violated provisions of the grant prohibiting conflicts of interest. *Id.* The *Harvard College* Court held that although one individual defendant had not personally presented any claims to the government, he could be liable under the FCA because he had participated in the process of submitting claims by approving invoices and expenses that would eventually be charged to the

federal government.  *Id.*  The Court noted that the defendant "was engaged in the claims process."  *Id.* at 188 n. 30.

*Sikkenga* likewise supports the disputed instructions.  There, plaintiff asserted that a defendant "caused" a false claim to be presented under the FCA.  *Sikkenga*, 472 F.3d at 713.  The Court held that "mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA."  *Id.* at 715 (citing *U.S. v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)).  Instead, the Court required "some sort of an affirmative action."  *Id.*

Active participation in the claims submitting process, however, is not sufficient.  While "mere knowledge of the submission of claims and knowledge of falsity" are insufficient in and of themselves for liability, such knowledge is required.  *See Harvard College*, 323 F.Supp.2d at 186 (considering whether each defendant met each FCA requirement).  If such knowledge were not required, FCA liability would extend to a person who, in complete ignorance (and absent circumstances indicating reckless disregard), delegated submission of false claims forms to a corrupt bookkeeper.

When reviewing a challenge to a jury instruction, however, a court "must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of

record.'" *Sims*, 902 F.2d at 533. The instructions did not ask the jury to determine whether AC had participated in the submission of claims to the government (for example), but whether AC had participated in "the *fraudulent* conduct which caused the *false claims* to be submitted." This Court believes that the reference to "fraudulent conduct" and "false claims" was sufficient to convey to the jury that AC needed to have done more than merely participate in what it believed was proper behavior, especially considering that Plaintiffs' theory was at all times that AC actually directed the discriminatory marketing practices central to this action. Fraudulent conduct, after all, necessarily requires the knowledge of falsity (even the jury instructions themselves admit that a fraudulent claim is one that is knowingly false).

## C. Plaintiffs' Closing Argument

AC argues that Plaintiffs' remarks during closing arguments regarding the "active participation" standard were erroneous and confusing to the jury, thus warranting a new trial. Plaintiffs assert that Defendants never objected to the closing arguments, and AC does not contest this fact. As such, this Court will not consider the impropriety of Plaintiffs' remarks.

## D. Sufficiency of the Evidence

Lastly, AC argues that it is entitled to either judgment as a matter of law or a new trial because the evidence put forth by Plaintiffs is insufficient to prove an FCA violation against AC.

As this Court held in denying AC's initial judgment as a matter of law, the evidence put before the jury was sufficient to prove that AC actively participated in AI's conduct that fraudulently induced the government to enter into the contract and that AC actively participated in AI's fraudulent conduct causing the false claims to be submitted.

In support of this motion, AC divides Plaintiffs' evidence into three categories and then attacks the evidence in these categories. First, AC contends that evidence in the category of "AC's involvement in AI's efforts to reduce third trimester enrollments" merely shows that AC and AI together compiled quarterly reports and that one of these referred to reducing third trimester enrollments. Plaintiffs' evidence, however, shows that the quarterly reports (called PMQI reports) were initiatives that were created jointly by AI and AC and which AC's CEO claimed to be "the very core of Amerigroup quality and cost improvement programs." One of these initiatives was to reduce third trimester enrollments. Plaintiffs showed that AI executives reported to AC regarding AI's progress under these initiatives regularly, and that AC employees were "very involved in helping" AI to "develop policy guidelines" including the policy to "not approach people . . . late in pregnancy." Plaintiffs also showed that AC employees would make policy directives during MOR meetings and that Major Job Objectives

("MJOs"), which were tied to bonuses and compensation, were issued by AC relating to the reduction of third trimester enrollments.

Second, AC asserts that evidence of AC's involvement in AI's marketing efforts was insufficient. Plaintiffs, however, showed that Herman Wright, AC's Chief Marketing Officer, who was in charge of creating marketing philosophy for the entire company, spent time training marketing representatives in Chicago. Mr. Wright would give AI "a lot of direction . . . and support . . ." via quarterly meetings with AI's Chief Marketing Officer. Mr. Wright testified that he did not target "unhealthies." Debra Gorden, the AC Regulatory Manager for the Illinois Plan, testified that AC would actively participate in the marketing strategies of the AI by making suggestions and changes to marketing materials and discussing the marketing materials with AI's CEO.

Third, AC contends that evidence of AC's communications with the IDPA was insufficient to support a jury finding against AC. Plaintiffs, however, put forth evidence at trial that: high-level IDPA employees like Carter did not draw any distinctions between AC and AI; Carter directed correspondence to AC regarding AI's failure to submit certain required documents; AI sent its April 30, 1999 Corrective Action Plan (promising not to discriminate against clients with health issues, including pregnant women) to the IDPA on AC stationary; AC submitted its AC "Illinois Marketing Specialists New Hire Training Facilitator's Guide" to IDPA (which

omitted any reference to the Illinois Plan's practice of avoiding pregnant women and "unhealties"); and AC regularly sent IDPA the submissions that were required by the IDPA contracts.

Thus, this Court finds that there was sufficient evidence to support the jury's finding that AC actively participated in AI's fraudulent conduct in submitting the false claims and in fraudulently inducing the IDPA to enter into the contracts.

## V. <u>DAMAGES</u>

### A. **Remittitur**

A court is granted wide discretion when considering a motion for remittitur. *Medcom Holding Co. v. Baxter Travenol Laboratories*, 106 F.3d 1388, 1397 (7th Cir. 1997). A court gives substantial deference to a jury's calculation of damages, but must also "ensure that the award is supported by competent evidence." *Farfaras v. Citizens Bank & Trust Co. of Chicago*, 2005 WL 670523 at *4 (N.D. Ill. Mar. 21, 2005). A court makes three inquiries: "whether the award is 'monstrously excessive'; whether there is no rational connection between the award and the evidence . . . ; and whether the award is roughly comparable to awards made in similar cases." *Id.* This test does not require a court to consider whether a jury traversed a logical path to reach its verdict, but merely to evaluate whether the end result was reasonable. *Outboard Marine Corp. v. Babcock Industries, Inc.*, 106 F.3d 182, 186 (7th Cir. 1997). Defendants each briefly argue that the jury's award of

$48 million in compensatory damages is excessive and contrary to the evidence.

As an initial matter, Plaintiffs argue that Defendants cannot make a remittitur argument because they failed to offer their own estimation of damages at trial. The cases hold that a defendant who "goes for broke" and offers no damages estimate risks being hit with a larger verdict than he might like. *See Kasper v. St. Mary of Nazareth Hosp.*, 135 F.3d 1170, 1177-78 (7th Cir. 1998); *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1230 (7th Cir. 1995). The bottom line in the cases, however, was that the verdicts were still reasonable. *Kasper*, 135 F.3d at 1177-78; *Avitia,* 49 F.3d at 1230. The mere fact that Defendants failed to offer an estimate of damages will not save an unreasonable or excessive award from remittitur. *See Republic Tobacco, L.P. v. North Atlantic Trading Co.*, 2003 WL 22794561 at *6 (N.D. Ill. Nov. 21, 2003) *rev'd. in part on other grounds*, at *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.,* 381 F.3d 717, 735 (7th Cir. 2004).

After reviewing the record, this Court concludes that the compensatory award is not "monstrously excessive" and is rationally related to the evidence presented. There was evidence put before the jury that the Defendants engaged in discriminatory marketing practices and then repeatedly lied to the IDPA about these practices. Mr. O'Brien gave the jury the following estimates of

damages: (1) approximately $38 million, $58 million, $62 million, or $78 million based on the discrepancy between AI's MLR and the peer group's MLR; (2) approximately $20 million not expended by Defendants on deliveries and NICU expenses due to the avoidance of pregnant women; (3) approximately $10 million for deliveries and associated NICU costs due to the avoidance of women in their third trimester of pregnancy; and (4) approximately $16 million if the IDPA had been using the 2003 contract's rate structure in 2000. Defendants' expert, Mr. Fisher, opined that if the difference between AI's MLR and the other Cook County MCOs' MLRs was due to illegal discrimination, damages would be approximately $45 million.

Additionally, Plaintiffs offered a damages estimate of $96 million, based on the difference between what AI received from the state and what it spent on medical expenses. Defendants argue that this represents a disgorgement of profits, damages not available under the FCA. *Taylor*, 2005 WL 2978921. The proper measure of FCA damages is the difference in the market values between what the government actually received and what it would have received but for the false claim. *Bornstein*, 423 U.S. at 316 n.13. Plaintiffs argue that this $96 million figure accurately measures the difference between what AI received from the state (the market value of non-discriminatory medicaid services) and the market value of the medical expenses actually delivered (the services actually provided to the government). The mere fact that this could also

constitute a disgorgement of profits does not negate the fact that it represents a proper estimate of damages under the FCA.

To say that the jury verdict was monstrously excessive on this record would be difficult. While this Court cannot know exactly how the jury reached its verdict, the verdict falls in the middle of the range of possible damage estimates presented, and closely lines up with the estimate espoused by the defense expert. The jury rejected Plaintiffs' argument that the proper damages were the $96 million difference between what the government was willing to pay for a non-discriminatory medicaid HMO and the medical services actually provided. Unfortunately for Defendants, the jury also rejected Plaintiffs' estimates of the cost savings made by AI as a result of discriminating against pregnant women in general and women in their third trimester of pregnancy. Instead, the jury settled upon an intermediate amount that falls within the range of damages suggested. *See Kasper*, 135 F.3d 1177-78.

Likewise, this Court cannot (as Defendants suggest) seize upon one of the various damages estimates and use this as the sole benchmark for evaluating the reasonableness of the award. Absent some legal or other deficiency in the higher estimates, this Court has to consider the jury's award in light of all of the estimates offered, not merely the estimate Defendants now choose to espouse. Consider the analogous situation where the defendant offers a low estimate of damages and the plaintiff offers a high estimate. It

would make no sense for a court to consider an intermediate award from the perspective of only the defendant's estimate (absent, of course, some reason for discounting the plaintiff's estimate).

Plaintiffs have publicly claimed that this verdict is "believed to be the largest ever by a jury under the federal False Claims Act."  This Court believes that while this may be true, it does not necessitate that the verdict is excessive - this Court believes that the fact that the verdict is the largest to date is likely due in large part to the fact that many FCA actions settle and note that Defendants do not attempt to point to a case with analogous facts.  As such, this Court cannot find that the jury's verdict is monstrously excessive, and will uphold it.

## B.  Trebling

Under the FCA, a defendant is liable for "3 times the amount of damages which the Government sustains because of the [defendant's] act"; the district court is responsible for applying the treble damages multiplier.  *U.S. v. Rogan*, 459 F.Supp.2d 692, 719-20 (N.D. Ill. 2006).  The jury found that the Government suffered $48 million in damages as a result of Defendants' acts.  As such, this Court enters judgment in the amount of $144 million against Defendants.

## C.  Civil Penalties

In addition to compensatory damages, both FCAs require that this Court assess civil penalties against Defendants based on the

number of false claims that they submitted. Although Defendants argued in their briefs that this Court should not "double count" the false claims by assessing penalties under both the state and federal acts, they conceded this point in oral argument. *See U.S. ex rel. Fahner v. Alaska*, 591 F.Supp. 794, 799-801 (N.D. Ill. 1984)(imposing civil penalties under both FCAs). Under the federal FCA, this Court must assess a fine per false claim between $5,500 and $11,000. *64 Federal Register 47099, 47103* (1999). Under the Illinois FCA, penalties range from $5,000 to $10,000 per false claim. 740 ILCS 175/3. Defendants concede that, absent Eighth Amendment concerns, this Court must impose penalties within the range provided by statute. It is within this Court's discretion whether to impose the maximum, the minimum, or some intermediate penalty. *Rogan*, 459 F.Supp.2d at 727.

### 1.  The Number of False Claims

In determining the number of false claims for which this statutory penalty should be assessed, "we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms." *Bornstein*, 423 U.S. at 313 n.8 (1976); *Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003). It is not enough for this Court to rubber-stamp the number of false claims as determined by the jury, as these are facts with constitutional import (in light of Defendants' Eighth

Amendment excessiveness arguments).  *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984); *A Woman's Choice – East Side Women's Clinic v. Newman*, 305 F.3d 684, 689 (7th Cir. 2002).

### a.  Sufficiency of the Trial Record as to the Number of Claims Forms

Defendants argue that because Plaintiffs did not move the 18,130 enrollment forms into evidence, there is insufficient evidence to uphold the jury's determination that there were 18,130 false claims.  Plaintiffs did not move 18,130 enrollment forms into evidence, but provided one enrollment form, PX 447, as an example.  Instead, the 18,130 figure comes from Mr. O'Brien's testimony, which Defendants argue is inadequate and should be ignored.

In *Hays*, a nursing home fraudulently claimed reimbursement for $6,000 worth of apples dispersed as gifts.  *Hays,* 325 F.3d at 992-94.  The district court determined that there were 336 false claims, some of which were outside of its jurisdiction; "obviously," this determination could not be upheld.  *Id.* at 993.  Thus, the Eighth Circuit undertook its own determination and eventually found that there were only eight false claims.  *Id.*  The Eighth Circuit dispensed with the expert testimony because the expert's "opinion as to the number of false claims was simply an unsubstantiated guess."  *Id.*  The Court's decision rested on the following factors:  (1) the expert's calculation was not in the record; (2) the expert had no first-hand knowledge of how claims

were submitted, (3) the expert's calculation was based on faulty assumptions regarding the method in which claims were submitted; *and* (4) the purported false claims were not in the record.  *Id.* Additionally, the Court noted "we have a more fundamental problem with the district court's decision to accept [the expert's] opinion as to the number of false claims:  his analysis focused not on the "conduct of the medical practitioner," (which creates FCA liability) but the "disposition of the claims by the government." *Id.* (citing *Bornstein*, 423 U.S. at 313, for the proposition that the number of false claims must be based on the violator's conduct).

This Court believes that there was sufficient evidence for the jury to find 18,130 false claims forms.  Unlike *Hays*, this figure rested on an adequate record – Mr. O'Brien's testimony - and not claims outside the court's jurisdiction.  Mr. O'Brien's opinion as to the number of false claims was not an "unsubstantiated guess." In reaching this figure, Mr. O'Brien counted the number of enrollment forms that contained at least one female between the ages of 17 and 44 for the relevant time period.  Although Mr. O'Brien did not consult the hard copies of these forms, he consulted an electronic database of eligibility files supplied by Defendants.  Thus, Mr. O'Brien's testimony is admissible under Federal Rule of Evidence 1006, as "the contents of voluminous writings . . . which cannot conveniently be examined in court may

be presented in the form of a chart, summary, or calculation" so long as the originals are made available for examination (as they were in this case). Mr. O'Brien's calculation is not perfect, but it is far less a guestimate than the *Hays* expert's calculation. Additionally, this Court notes that Mr. O'Brien, unlike the *Hays* expert, counted the claims submitted by the Defendants, not the times the Government reimbursed those claims. The mere fact that Plaintiffs failed to move the 18,130 forms into evidence is not enough for this Court to discount Mr. O'Brien's evidence and the jury's determination that there were 18,130 claims. It is irrelevant that Plaintiffs cannot show how many were rejected by the IDPA, because each represents payment sought (even if not granted), the standard under the FCA. 31 U.S.C. §§ 3729(a)(1)-(2).

In fact, this Court is somewhat mystified by the Defendants' argument. Defendants have apparently forgotten that Plaintiffs did move into evidence evidence indicating that Defendants had submitted over 33,000 enrollment forms in the relevant time period (in the form of an answer to a request to admit). If this Court were to ignore Mr. O'Brien's testimony and the jury's determination of the number of false claims, the evidence actually supports a finding that *all* of these enrollment forms were false claims as they sought inflated capitation payments.

*b.  Number of Claims for the Purposes of the Federal FCA*

Defendants also argue that the evidence shows that there were, at most, only twenty-four false claims submitted to the United States, and thus, only twenty-four false claims for the purposes of the federal FCA.  This argument is precluded by *Bornstein*.  In *Bornstein*, a subcontractor made three shipments of falsely marked components to a general contractor who incorporated these components into a product and billed the government in thirty-five separate invoices.  *Bornstein,* 423 U.S. at 312-13.  The Court held that there were only three false claims, as "the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the [civil penalties]."  *Id.*  The Court also noted that this also works against the violator; had the general contractor submitted a single invoice, the subcontractor would still have been liable for three FCA violations.  *Id.* at 313.  As such, AI is liable under the Federal FCA for the number of enrollment forms submitted to the IDPA and the number of claims for the purposes of the federal FCA is also 18,130.

### 2.  The Penalties

As noted above, it is within this Court's discretion where within the statutory range to fix the civil penalties under the two FCAs.  *Rogan*, 459 F.Supp.2d at 727.  In making that determination, a court looks to the totality of the circumstances, including the egregiousness of the conduct, the government's monetary damages,

any other damages that the government might have incurred, the right of the government to be made completely whole, and general fairness. *Id.* (citations omitted). Additionally, courts fixing civil penalties generally will consider the gravity of the offense, a defendant's acceptance of responsibility or lack of remorse, the need for deterrence, and possible recidivism. *S.E.C. v. Lipson*, 129 F.Supp.2d 1148, 1159 (N.D. Ill. 2001). Plaintiffs seek the maximum statutory penalties and Defendants request the minimum.

This Court can find little guidance in determining where to fix the penalties besides the general considerations as outlined above. *See U.S. ex rel. Virgin Islands Hous. Auth. v. Coastal General Constr. Services Corp.*, 299 F.Supp.2d 483, 489 (D.V.I. 2004). In fixing damages, this Court acknowledges that Defendants pilfered money from Medicaid coffers to pad its own pockets. Defendants' actions, furthermore, undermined the Medicaid system's integrity and deprived discriminated-against women and "unhealthies" access to a particular HMO network (and in some cases, no doubt, to medical care). This Court will not consider Defendants' discovery and litigation strategies; in these, Defendants merely engaged in a meaningful defense against charges brought against them.

This Court, however, also believes that it must consider fairness in determining the penalties. *See id.* Here, the civil penalties (even if fixed at the minimum allowable) grossly outrun

any damages estimate. *See U.S. v. Lorenzo*, 768 F.Supp. 1127, 1133 (E.D. Pa. 1991). Defendants correctly argue that this case addresses the wrongdoing of AC and one Amerigroup subsidiary in one state over a three (or five year, according to Plaintiffs) time span, rather than a longer time or a broader swath of AC's business. Plaintiff's case, although strong, was not compelling. There was significant evidence that Defendants relied on IDPA's acquiescence in their scheme even if the jury rejected this theory. This Court, however, cannot seriously consider Defendants' contention that the bonding requirements for a $524,000,000 penalty would not be readily obtainable – as this Court has been made aware that Defendants have obtained a $550 million line of credit (which will allow them to obtain such a bond). *See* Amerigroup's 1/26/2007 8K, available at ***http://biz.yahoo.com/e/070126/agp8-k.html***.

This Court is convinced that Defendants' conduct was egregious and calculated. It is not convinced, however, that a penalty at the maximum of the range is warranted. Instead, this Court believes that it must seriously consider fairness and impose a penalty at the minimum of the statutory range for each claim. As such, this Court fixes a fine of $5,500 for each claim under the federal FCA and at $5,000 under the Illinois Whistleblower Reward and Protection Act. *See Williams*, 2003 WL 21384640 (N.D.Ill., June 12, 2003)(although scheme extended five years and was not a temporary lapse in judgment, court set penalties at minimum out of

interest in fairness to Defendants).  This Court believes that such a penalty will adequately serve the Plaintiffs' interests in deterrence without being unfair to Defendants.  As such, this Court imposes a penalty of $99,715,000 under the federal FCA and $90,650,000 under the Illinois Whistleblower Reward and Protection Act, for a total of $190,365,000 in civil penalties.

### D.  Eighth Amendment Excessiveness

Although a court is bound by Congress' mandated FCA damages, "in cases in which the Eighth Amendment is applicable, a court must still independently assess whether any fine levied comports with the Amendment's requirements." *U.S. v. Williams*, 2003 WL 21384640 at *4 (N.D.Ill. June 12, 2003).

### 1.  *Applicability to Corporations*

Plaintiffs contend that the Eighth Amendment's Excessive Fines Clause does not apply to corporations.  No court has explicitly held that it does, although several cases have applied it in cases involving both individual and corporate defendants.  *See Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal*, Inc., 492 U.S. 257, 284 (1989)(O'Connor, J., dissenting and concurring) (flagging issue as open question); *see, e.g.*, *U.S. v. Advance Tool Co.*, 902 F.Supp. 1011, 1018 (W.D. Mo. 1995); *U.S. ex rel. Smith v. Gilbert Realty Co., Inc.,* 840 F.Supp. 71 (E.D. Mich. 1993).

Corporations are generally regarded as persons with respect to Constitutional rights unless the context of a specific provision

limits its application to a natural person. H. Henn & J. Alexander, *Laws of Corporations §80* (3d Ed. 1983). As such, "[c]ertain purely personal guarantees are unavailable to corporations [where] the historic function of the particular guarantee has been limited to the protection of individuals." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 779, n. 14 (1978)(internal quotations omitted). Corporations have, for example, "no Fifth Amendment privilege against self-incrimination or right to privacy." *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 284 (1989)(O'Connor, J., dissenting and concurring). They are, however, afforded safeguards against unreasonable searches and seizures, equal protection violations, and deprivations of liberty and property without due process. H. Henn & J. Alexander, *Laws of Corporations § 80*. As the reasoning goes, corporations are subject to the same abuses of state power as individuals when it comes to these rights. *See, e.g., Browning-Ferris*, 492 U.S. at 285 (O'Connor, J., dissenting and concurring)(citing *First Nat. Bank of Boston*, 435 U.S. at 779). However, these abuses are overridden when the privilege against self-incrimination and the right to privacy are involved because the state has a legitimate interest in ensuring "that corporate behavior is consistent with the law and the public interest." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

Before the Eighth Amendment was regularly applied to the states through the Fourteenth Amendment's Due Process clause, the Supreme Court reviewed that clause's applicability to "fines and monetary penalties imposed on corporations" who alleged that the penalty imposed amounted to a deprivation of property without due process. *Browning-Ferris*, 492 U.S. at 285 (citing *Waters-Pierce Oil Co. v. State of Texas*, 212 U.S. 86, 111-112 (1909)). Both the Excessive Fines Clause and the Due Process Clause are concerned with ensuring that the state does not abuse its "prosecutorial" power by inequitably depriving its constituents of property. *Id*. at 266. Since corporations and individuals are equally capable of holding property, they are both subject to abuses of state power relating to the inequitable deprivation of such property. *See Browning-Ferris*, 492 U.S. at 285. Therefore, there is little reason to assume that corporations are not entitled to the protection of the Excessive Fines Clause, and this Court will apply that clause to Defendants. *See Advance Tool*, 902 F.Supp. at 1018.

## 2. *Standard*

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const. Amend. VIII.* A statutory penalty constitutes a "fine" subject to Eighth Amendment review if it constitutes punishment for an offense. *U.S. v. Bajakajian*, 524 U.S. 321, 328 (1998). A fine is "punishment" if it "cannot fairly

be said solely to serve a remedial purpose, but . . . also serv[es] either retributive or deterrent purposes." *Austin v. U.S.*, 509 U.S. 602, 609-610 (1993). Statutory penalties under the FCA meet this standard, as the damages imposed by the FCA are "punitive in nature." *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,* 529 U.S. 765, 784 (2000); *U.S. ex rel. Chandler v. Cook County, Ill.*, 277 F.3d 969, 977 (7th Cir. 2002). Courts have subjected fines under the FCA to Eighth Amendment excessiveness analysis. *See, e.g., U.S. v. Mackby*, 261 F.3d 821, 831 (9th Cir. 2001).

A fine violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. Because the standard is whether the fine is "grossly disproportional," the fine need only bear some relationship to the offense's gravity; this is not a proportionality inquiry. *Id.* at 334-36. Such an inquiry must thus recognize both that "judgments about the appropriate punishment for an offense belong in the first place to the legislature" and that "any judicial determination regarding the gravity of a particular . . . offense will be inherently imprecise." *Id.* (citing *Solem v. Helm*, 463 U.S. 277, 288, 290 (1983)). To determine if the fine is grossly disproportionate, a court compares the fine to the gravity of the defendant's offense; considering (1) the extent and nature of the harm caused; (2) the possible maximum penalty available

under the FCA and other statutes; and (3) the class of persons for whom the statute was designed. *Id.* at 336-39; *Mackby*, 339 F.3d at 1017-19. When determining if an FCA fine violates the Clause, a court considers the total award – including the treble damages and civil penalties – together. *Mackby*, 261 F.3d at 831; *Towers v. City of Chicago*, 173 F.3d 619, 624 (7th Cir. 1999). In an Excessive Fines Clause inquiry, the burden rests on the defendant. *Bajakajian*, 524 U.S. at 348 (Kennedy, J. dissenting).

### 3. The Penalty Imposed is Not Grossly Disproportionate

This Court finds that the penalty imposed under the FCAs is not "grossly disproportionate" under the Eighth Amendment.

#### a. Deference to Congress

As instructed by *Bajakajian*, this Court must consider the fact that Congress set the FCA penalties. *Bajakajian*, 524 U.S. at 334-36. Congress determined that an FCA violation is a serious offense for which the appropriate penalty is the trebling of the government's damages and an additional $5,500 to $11,000 civil penalty. *Rogan*, 459 F.Supp.2d at 719-20. When passing the 1986 FCA amendments, "[it] could not be more clear that Congress . . . addressed the situation with careful precision as to what sort of damage scheme was necessary to achieve the goals of the statute." *Chandler*, 277 F.3d at 978. Congress' penalty determinations "represent the collective opinion of the American people as to what is and what is not excessive." *U.S. v. 817 N.E.*

*29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1310 (11th Cir. 1999)(applying *Bajakajian* in the context of a criminal forfeiture of land used in criminal activity).  This is not to say that the fine could not still be grossly disproportional to the offense, but many courts have deferred to Congress' determination.  *Kelly v. U.S E.P.A.*, 203 F.3d 519, 524 (7th Cir. 2000); *Balice v. U.S. Dept. of Agriculture*, 203 F.3d 684, 698-99 (9th Cir. 2000); *U.S. v. Bieri*, 68 F.3d 232, 238 (8th Cir. 1995); *but see Bajakajian*, 524 U.S. at 336.

> b.  *Extent and Harm of Defendants' FCA Violations*

A court must consider the extent and harm of the violations. *Bajakajian*, 524 U.S. at 336.  Defendants engaged in discriminatory marketing practices to increase their profit margin and the jury fixed the government's damages at $48 million dollars.  *See id.* at 339-40 (harm minimal because defendant engaged in no fraud and his crime caused no loss to the public fisc).  Defendants' actions cannot be "characterized as an isolated lapse in judgment," but constituted a several years long, institution-wide goal to fleece Defendants' pockets at the expense of the government, the Medicaid system, and the avoided pregnant women and "unhealthies."  *See Williams*, 2003 WL 21384640 at *6 (considering in course of excessiveness analysis that defendants' actions were not isolated but spanned five years).  The harm of false claims, furthermore, "extends beyond the money paid out of the treasury."  *Mackby*, 339

F.3d at 1019. "Fraudulent claims make the administration of [Medicaid] more difficult, and widespread fraud . . . undermine[s] public confidence." *Id.* (citing S.Rep. No. 99-345, at 2-3).

In stark contrast is *Gilbert Realty.* In *Gilbert Realty,* the defendant violated the FCA by making seven false statements to the local housing authority and by endorsing fifty-one rent checks, each governed by a contract stating that an endorsement constituted certification of non-receipt of rent beyond the amount allowed. *Id.* at 71. The court found actual damages in the amount of $1,630, but was asked to impose $290,000 in civil penalties, a ratio of 178:1. *Id.* at 74. In finding the penalties to be excessive, the court considered the nature of the conduct, noting that "one does not normally expect a landlord to consider the terms of the rental agreement for an inexpensive residential apartment each time a rent check is cashed." *Id.* at 75.

Here, the ratio of the total judgment ($334 million) to actual damages ($48 million) is approximately 6.9:1. This Court, like *Gilbert Realty*, will not "simply [adopt] a mathematical proportion"; but will consider that such a ratio appears appropriate considering the degree and nature of the harm here. This Court notes that higher ratios have been upheld by courts engaging in Excessive Fines Clause inquiries. *See, Mackby*, 221 F.Supp.2d at 1114-15 (ratio of 11.5:1); *U.S. v. Byrd*, 100 F.Supp.2d 342 at 343 (ratio of 15.5:1).

*c.  Comparable Penalties*

Under *Bajakajian*, this Court must consider how the fines to be imposed compare to other fines available for Defendants' actions.

i.  Under the Civil FCA

A court may properly consider the maximum penalty prescribed by Congress as part of its Excessive Fines inquiry.  *Kelly,* 203 F.3d at 524 (considering excessiveness of fines under the Clean Water Act; upholding fine because significantly lower than maximum allowed under Act); *Mackby*, 339 F.3d at 1018; *Balice*, 203 F.3d at 669; *U.S. v. Emerson*, 107 F.3d 77, 80-81 (1st Cir. 1997).  Here, the maximum civil penalties (including the trebled $48 million and maximum civil penalties on 18,130 claims) are approximately $524 million.  This Court seeks to impose approximately $334 million, considerably less than that amount.

ii.  Under the Criminal FCA

Additionally, a court may compare the civil penalties under the FCA to the criminal fines the defendant would have faced had the defendant been tried under the criminal FCA.  *Bajakajian*, 524 U.S. at 338; *Mackby*, 339 F.3d at 1018.  Defendants' and Plaintiffs' estimates of the potential criminal FCA fine differ, with Defendants fixing the fine at approximately $60.6 million and Plaintiffs' fixing it at between $144 and $240 million.  While a $334 million dollar judgment here might seem disproportionate, this Court must also take into account the full criminal penalty,

including a criminal sentence or other consequences.  *See Mackby*,
339 F.3d at 1018 (citing *Bajakajian*, 524 U.S. at 338)(considering
the potential criminal sentence).  If Defendants were convicted
under the criminal FCA, Defendants could not participate in *any*
federal health care program for five years, a consequence with
significant financial impact.  42 U.S.C. § 1320a-7(a).  Any
individuals employees also convicted would face jail time.

### iii.  Other Possible Penalties

In addition to the penalties under the criminal FCA, the law
provides for other penalties for the actions at the heart of this
suit.  The Office of the Inspector General is authorized to impose
a fine of up to $100,000 for each time that "a contracting
organization . . . engaged in any practice that would reasonably be
expected to have the effect of denying or discouraging enrollment
by people whose medical condition or history indicates a need for
substantial future medical services."  42 C.F.R. § 1003.103
(f)(3)(ii).  Defendants do not contest the provision's applica-
bility.  If this provision does indeed apply to each time that
Defendants avoided or attempted to avoid a pregnant woman or
"unhealthy," potential administrative fines run into the millions.

Additionally, 42 U.S.C. § 1320a-7(b)(7) provides for the
exclusion of a business from participating in Medicaid and other
federally-funded health care if found to have been engaged in

fraudulent conduct. Given that Defendants' sole business is Medicaid HMOs, this exclusion's dollar value is extremely high.

Defendants assert that this Court should consider that the total judgment is highly disproportionate when compared to the remedies provided in the IDPA contracts. The IDPA contracts permitted the IDPA to impose a sanction of $5,000 to $25,000 if it discovered that AI was engaged in a pattern of discrimination relating to pre-exising conditions. This Court notes that these sanctions are far less than those under the FCA. Defendants have not considered, however, that these sanctions may very well have been intended to be a secondary sanction – after liability under state and federal statutes was already obtained. Furthermore, other possible penalties *are* in line with the civil penalties.

*d. Class For Whom the FCA was Principally Designed*

Defendants are within the class of person towards whom the FCA was principally designed. In *Bajakajian*, the Court found it significant that Bajakajian's crime was merely failing to report large amount of currency that he attempted to leave the country with, but that the money was his and he intended to use it for a legal purpose. *Bajakajian*, 524 U.S. at 338. Bajakajian did not fit into the class of person for whom the forfeiture provision was designed – money launderers, drug traffickers, and tax evaders. *Bajakajian*, 524 U.S. at 338; *Mackby*, 339 F.3d at 1017. The FCA targets those who knowingly make a false claim for payment to the

government.  31 U.S.C. 3729(a)(1); *Mackby*, 339 F.3d at 1017. Defendants are therefore precisely within the group targeted by the FCA.

### e.  Defendants' Arguments are Misplaced

Defendants' primary argument for the excessiveness of the penalties is an economic one – that Defendants either cannot ever hope to pay the penalties this Court will levy or that the penalties are grossly excessive because of the economic harm they will wreak on Defendants.  As Plaintiffs point out, this was not a factor considered by the Court in *Bajakajian*.  *Bajakajian*, 524 U.S. at 334-36.  Defendants, who have the burden, have cited to no case considering the defendant's ability to pay in the course of an excessive fines inquiry.  Plaintiffs do cite to one, but there, the court determined that the inquiry was not whether the defendant could pay the fine on the day judgment was entered, but whether he might someday be able to satisfy the judgment.  *Emerson*, 107 F.3d at 81.  At least one court has refused to consider a fine's economic impact on a defendant when conducting an Excessive Fines Clause analysis.  *817 N.E. 29th Drive*, 175 F.3d at 1311 (rejecting defendant's argument that forfeiture was excessive because the property forfeited was his personal residence, and he would be unable to purchase another).  "Whether a forfeiture is 'excessive' is determined by comparing the amount of the forfeiture to the gravity of the offense . . . and not by comparing the amount of the

forfeiture to the amount of the owner's assets." *Id.* It is not Congress' obligation, when setting statutory penalties, "to make illegal behavior affordable, particularly for multiple violations." *Phillips Randolph Enterprises, LLC v. Rice Fields*, 2007 WL 129052 at *3 (N.D. Ill. Jan. 11, 2007)(evaluating whether statutory damages resulting from a class action might violate the Due Process Clause). This Court will not undertake an economic analysis - it seems that the excessiveness of a penalty should turn on the nature of the Defendants' conduct, not the state of his coffers. Defendants' argument, furthermore, is significantly weakened by the fact that it has obtained a $550 million line of credit for the purpose of satisfying the judgment in this case.

The cases cited by Defendants do not persuade this Court that the fines to be imposed here violate the Eighth Amendment. The Eighth Circuit, in *Hays*, never reached the excessive fines analysis. *Hays*, 325 F.3d 982. Additionally, reliance on *U.S. v. Cabrera-Diaz*, 106 F.Supp.2d 234 (D.P.R. 2000) is misplaced as it predated *Bajakajian* and appears to have applied an entirely different standard from the one espoused there.

More in Defendants' favor is *Advance Tool*. There, defendant sold over one thousand tools he knew were not brand name tools as required. The Court reduced the civil penalties because the Court believed the fines to be unconstitutionally excessive "based upon Plaintiff's inability to prove actual damages . . . the

government's poor investigative procedures, and its confusing regulatory and contractual purchasing arrangements which virtually encourage the type of conduct at issue here." Despite the fact that defendant had been providing the government with substandard tools (which could have caused significant harm), the *Advance Tool* court believed that certain factors precluded this from being the forefront consideration. It is important to note that *Advance Tool* predates *Bajakajian*'s illumination of a standard for excessive fines analyses. The factors it considers are some of those advanced by Defendants – specifically, that Defendants' culpability is decreased by the IDPA's supposedly confusing directives regarding the importance of continuity of care for pregnant women and enrollees with existing health problems. Although this might be a valid consideration, this Court adequately considered it when fixing the penalties themselves. Furthermore, there was also evidence offered indicating that Defendants' primary objective when avoiding pregnant women and "unhealthies" was saving a buck, not encouraging continuity of care. As such, this Court does not find the reasoning in *Advance Tool* persuasive.

Although Defendants' post-trial briefs focus heavily on Due Process cases like *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-17 (2003) and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562-63 (1996), Defendants admitted at oral arguments that the Due Process Clause does not apply to statutory damages.

Tellingly, *Bajakajian* did not consider the previously established Due Process case law, and Defendants have cited no Excessive Fines case which does. *Bajakajian*, 524 U.S. 334-44. As the Northern District of Illinois has recently held, "considerations pertinent to the validity of jury awards are not the same as those attendant to damage amounts set by statutes . . . the legislature is justified in establishing an amount of damages that could be oppressive in other settings." *Phillips Randolph*, 2007 WL 129052 at *2. As such, these cases are simply not relevant.

Lastly, Defendants argue that the civil penalties do not have a reasonable relationship to the alleged fraudulent conduct. Defendants point out that they are in this predicament because the jury determined Defendants avoided enrolling pregnant women and "unhealthies," but this Court is imposing penalties based on the number of women that they *did* enroll. As a result of this, Defendants assert that if they had avoided less women, they would be liable for *more* civil penalties (each woman not avoided would result in another enrollment form on which civil penalties must be assessed). Defendants assert that this renders the civil penalties out of proportion with the harm done to the government. While Defendants' argument has some logical appeal, it is misplaced. Congress is clear in the FCA that civil penalties are assessed upon false claims, and the jury determined that the Defendants submitted 18,130 false enrollment forms. If Congress had provided civil

penalties based on a measure of harm actually caused (the avoided women are one measure of the harm caused by Defendants), then this Court might be able impose liability based on the women and "unhealthies" avoided – but as the FCA currently stands, this Court cannot. Besides, this Court has already considered the total award in reference to the harm done to the government – $48 million dollars as assessed by the jury – and found it to be proportionate.

### f. Conclusion

This Court finds that the Defendants have failed to carry their burden to show that the total judgment ordered by this Court is grossly disproportionate under the Eighth Amendment. As explained above, each of the *Bajakajian* factors weighs in favor of the judgment's proportionality.

### VI. **CONCLUSION**

For the reasons stated herein, Defendant AI's and AC's Motions for Judgment as a Matter of Law, New Trial, and Remittitur are denied.

Plaintiffs' Motion for Imposition of the Maximum Level of Penalties is granted in part and denied in part.


**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:    3/13/2007